**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Morgan O'BRIEN, Donald Sheehy, and David Mizaur, Defendants-Appellants.**

**Nos. 78–1970, 78–1972 and 78–1982.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1979.

Decided April 8, 1980.

Rehearing and Rehearing In Banc
Denied May 6, 1980.

John A. Meyer, Chicago, Ill., for Sheehy.

Kenneth L. Cunniff, Chicago, Ill., for Mizaur.

Jeffrey Steinback, Chicago, Ill., for O'Brien.

Thomas P. Sullivan, U. S. Atty., Gerald J. Rafferty, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SPRECHER and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

Appellants were convicted of conspiring to commit fraud by wire communication, in violation of 18 U.S.C. § 371, and of actual wire fraud, in violation of 18 U.S.C. § 1343.

The indictment alleged that in June of 1974, appellants O'Brien, Mizaur, Sheehy, and others [1] conspired together to devise a scheme to defraud various poultry companies of their products. The indictment also charged appellants with use of wire communications in the planning and implementation of their scheme.

In June of 1974, Warren Tauber met with appellants O'Brien, Mizaur and Sheehy, along with Frank Turner and Burton Brown, for the purpose of devising a "scam" operation. Several suggestions were considered, and ultimately they devised a scheme whereby large quantities of poultry would be purchased on credit over a short period of time, and payment would never be made. At subsequent meetings that year the scheme was further refined. The evidence at trial showed that Mizaur and Sheehy suggested the use of the Porter Trading Co. to purchase the poultry. Porter Trading Co. had been established during the summer of 1974 by Mizaur and Sheehy. Mizaur and Sheehy already owned Beef's Finest, a purveyor of home freezer meats. Upon establishing the new company, they installed George Porter, an employee of Beef's Finest since April 1974, as president of Porter Trading Co. The Porter Trading Co. consisted of a one room office directly behind Mizaur's Beef's Finest store. A Porter Trading Co. telephone extension was installed in the Beef's Finest Shop, so that orders could be placed from the latter shop. Initially, Porter placed an order for pork products. Shortly thereafter, however, appellants arranged for Porter to hire one Hal Brenner, who was in fact Warren Tauber, to handle the ordering. Tauber, Turner and Mizaur would actually order the poultry products, posing as the fictitious Brenner. False credit references were prearranged by Mizaur and Sheehy at the Dubuque Packing Co., and by Morgan O'Brien at R. O'Brien & Sons, of which he was a part owner. In addition, Burton Brown rented an office and listed a phone in the name of American Finance and Factoring Co. to provide a further credit reference for Porter Trading Co.

Once the poultry suppliers verified the credit references, they would contact Porter

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. Defendants Warren Tauber, Barry Brown and Burton Brown plead guilty to the charges. The jury acquitted defendants Frank Turner, Joseph Indovina and Herbert Thomas. The jury convicted defendant John Sullivan, however, the Court granted his motion for judgment of acquittal notwithstanding the verdict.

Trading to indicate their willingness to do business. The call would be received by Sheehy on the Porter Trading Co. extension at Beef's Finest. Sheehy would in turn contact Tauber, or whoever was playing the role of Brenner that day, and he would place a large order for poultry on credit. The poultry was then delivered to a cold storage company where it was in turn sold to R. O'Brien & Sons or to legitimate purchasers. During the course of the scheme, nine companies made twenty-five shipments to Porter for a total of $318,746.20.

Warren Tauber ultimately agreed to cooperate with the Federal Bureau of Investigation. On June 8, 1976, Tauber telephoned both O'Brien and Mizaur and recorded those conversations. Tauber also contacted Sheehy by telephone on July 26, 1976. In those conversations appellants made incriminating statements regarding their involvement in the poultry scheme. There were also references made to invoking the Fifth Amendment before the Grand Jury, both by Tauber and by the persons to whom he spoke. At trial the Government sought introduction of those tapes, with the references to appellants' invoking the Fifth Amendment redacted. The tapes were admitted as admissions by the defendants, over objections.

In addition to the recorded conversation, the Government also elicited testimony regarding two prior similar acts of fraud involving appellants. The first prior similar act involved the removal of labels from inedible pork snouts to be replaced by labels indicating the more costly edible pork snouts. This was done at R. O'Brien & Sons by Tauber and Turner, acting with the approval of Morgan O'Brien. These acts occurred during the summer of 1972. The second prior similar act admitted into evidence involved a scheme to defraud Dubuque Packing Co. The principal perpetrator of this scheme was Tauber. He arranged, through John Sullivan, the general manager of the Chicago office of Dubuque Packing, to purchase meat products at a price significantly below market value. Sullivan would prepare false invoices reflecting a lesser purchase at its appropriate

price and a substantially larger amount of meat products would actually be delivered to Tauber's meat company in Chicago. Once Tauber had sold the meat products to others, such as Sheehy at Porter Trading Co. and R. O'Brien & Sons, Tauber would pay Sullivan a kickback for his participation. This scheme was ongoing at the time that Tauber, Sheehy, Mizaur and O'Brien were meeting to set up the poultry scheme. During those meetings Tauber described the ongoing arrangement with Sullivan and inquired of O'Brien regarding Sullivan's reliability. Tauber also asked Sheehy's advice on which meat products would be easiest to dispose of quickly. Sheehy also agreed to purchase some of the meat products from Tauber through the Porter Trading Co. Mizaur also participated in these discussions.

The District Judge considered the question of the admissibility of the edited taped conversations and of the alleged prior similar acts at length. Extensive argument addressing these issues was heard prior to the selection of the jury. The District Judge concluded that the taped conversations—once the references to the defendants' possible invocation of the Fifth Amendment were removed—constituted admissions by the respective defendants and were admissible. With regard to the prior similar acts, the Court concluded that they were admissible under Federal Rule of Evidence 404(b) for the purpose of establishing intent, absence of mistake or accident and the relationship between the defendants.

The appellants claim that the admission of this evidence constituted reversible error. In addition, appellants attack the convictions on the grounds that the prosecutor made prejudicial statements in closing rebuttal; that evidence relating to plea related discussions was improperly admitted, and that appellants were denied their Sixth Amendment right to confrontation due to the government's use of leading questions.

Appellants' claims of prejudicial comment during the government's closing rebuttal can be summarized as follows. First, appel-

lant O'Brien claims that government counsel improperly attributed damaging admissions to his counsel with respect to false credit references. Second, O'Brien claims he was severely prejudiced by the government attorney's remark that O'Brien's counsel was "playing fast and loose with the facts," and that the Court's subsequent curative remarks and instructions were inadequate. Third, appellants contend the government improperly commented upon their telephone records in evidence. And fourth, O'Brien claims that the prosecutor made improper reference to his failure to testify. These matters, and the Court's handling of them, are discussed more fully in Section III, *infra.*

Appellants' argument with respect to plea negotiations is based on the admission of a recorded conversation between Tauber and Sheehy relating to the possibility of "cutting a deal" with the FBI. Tauber asked Sheehy if he thought a deal was possible, and Sheehy responded that he doubted it, but that the FBI Agent had stated, "I'm not promising you anything, but if you want to talk, . . . maybe I can help you." The Government contends that the entire conversation between Tauber and Sheehy simply indicated that Sheehy was indecisive as to how to approach the investigation, and further, that because the statements were not made to an agent of the Government they do not constitute plea negotiations.

Finally, appellants contend that the District Court permitted excessive use of leading questions of a key witness so as to constitute a denial of their Sixth Amendment right to confrontation. The Government admits to the use of leading questions during direct examination of Warren Tauber, but argues that the District Judge has discretion under Rule 611(c) of the Federal Rules of Evidence to permit the use of leading questions in some instances, that the Court exercised that discretion in the present case, and that the Court did not abuse its discretion.

We affirm the decision of the District Judge as to each of the points raised by appellants.

## I. THE PRIOR SIMILAR ACTS

■ Evidence of prior similar crimes or acts are admissible if such acts have a "substantial relevance" to an issue other than a general criminal character and a propensity to commit criminal acts. *United States v. McPartlin*, 595 F.2d 1321 (7th Cir. 1979). Here, the government offered the prior similar schemes to negate the defense of absence of criminal intent. The testimony of Tauber in which the prior schemes were recounted would, indeed, tend to show that at the time the defendants ordered meat products from various purveyors their intent was to defraud them rather than engage in legitimate business transactions.

Appellants' attack on the admission of this testimony is three-pronged. They claim: (1) that the prior acts were not sufficiently similar; (2) that the acts were not established by clear and convincing evidence; and (3) that the probative value of this evidence was outweighed by the risk of prejudice.

■ Appellants' first argument clearly misses the central point regarding admissibility. The evidence was not admitted because it reflects the use of a common scheme or plan. Rather, the testimony was admitted because it was probative of intent. The degree of similarity is relevant only insofar as the acts are sufficiently alike to support an inference of criminal intent. The similar acts need not be duplicates. *U. S. v. Weiler*, 385 F.2d 63 (3rd Cir. 1967). *See also, U. S. v. McPartlin, supra* at 1343. In the present case the prior acts all involve schemes to commit fraud in connection with the purchase or sale of meat or poultry products. The second prior similar act also involves the use of forged documents. Both prior acts occurred either concurrently with the poultry scheme or within two years of it. Appellants were all involved in the prior acts to some degree. The District Judge weighed all of these factors and concluded that the acts were sufficiently similar to warrant admission, and we find that conclusion amply supported in the record.

■ Appellants' contention that the prior similar acts were not established by clear and convincing evidence is also without merit. Warren Tauber, a key participant in both prior acts, testified from his first hand knowledge of the defendants' involvement in the prior activities. Direct testimony of the defendants' participation in the prior schemes is sufficient to meet the clear and convincing standard; *United States v. Dolliole*, 597 F.2d 102, 107 (7th Cir. 1979). *United States v. Dixon*, 596 F.2d 178, 182 (7th Cir. 1979). The absence of corroboration alone will not render the testimony insufficient. *Dolliole* at 107. As this Court has stated, "If the witness was to be believed, his testimony was sufficiently clear and convincing." *United States v. Cyphers*, 553 F.2d 1064, 1070 (7th Cir. 1977). While a review of Tauber's testimony does disclose a lack of clarity as to certain details, we do not find his testimony to be so incredible as to render the Court's admission of that testimony an abuse of discretion.

■ Appellants' contention that the prejudicial nature of Tauber's testimony outweighs its probative value merits little discussion. The standard for review of such a determination under Rule 403 of the Federal Rules of Evidence is whether there was an abuse of discretion by the District Judge. The District Judge considered the matter at a lengthy pretrial hearing and concluded that the probative value of the evidence outweighed any potential prejudice. Our review of the record reveals that the Court below properly exercised its discretion in reaching that conclusion.

## II. THE RECORDED CONVERSATIONS

Appellants contend that the tapes and transcripts of tapes presented to the jury acted as improper and prejudicial comment on appellants' assertion of the Fifth Amendment before the Grand Jury. At the outset, we note that there are discrepancies between the government's version of the tape played to the jury and the quoted portions of the tape contained in appellants' brief. Appellants' version of the tape includes indirect references by both O'Brien and Mizaur to the possibility of invoking the Fifth Amendment before the Grand Jury. Appellants quote the following dialogue between Tauber and Morgan O'Brien:

"Tauber: He [Burton Brown] wasn't gonna, [invoke the Fifth Amendment before the Grand Jury] but he is still trying to, you know, when your're talking about a preamble.

O'Brien: Yeah.

Tauber: Are you still going to do that?

O'Brien: No, no, no. I was talking to my attorney about it. He said, 'Listen to people you're going to be talking to down there,' he says, 'Don't give them any more fuel for their little fires and, you know, don't go back a year or two years. Tell them how you have been harassed.'."

Also, in response to a comment by Tauber to the effect that O'Brien was concerned that Mizaur might make incriminating remarks before the Grand Jury, Mizaur is quoted as saying: "Nobody's throws shot at me . . . *Because I can only read my paper.*" (Emphasis supplied) The reference to reading "my paper" was apparently intended to mean reading a prepared statement asserting the Fifth Amendment.

■ While these statements were made and recorded by Tauber, they were extracted from the recordings prior to being played to the jury.[2] Thus, the indirect references to taking the Fifth Amendment made by O'Brien and Mizaur were not heard by the jury.[3] Our review of the edited transcript reveals no prejudicial er-

---

**2.** It is unclear how this discrepancy occurred. The transcript of the recorded conversations on file with the Court, however, clearly does not contain the above-quoted statements.

**3.** Even if these remarks were heard by the jury, we do not believe they constitute impermissible comment on the appellants' exercise of their Fifth Amendment rights. We consider it inexcusable, however, that appellants would misstate the record as to what was actually heard by the jury.

ror. While there are references to other person's consideration of invoking the Fifth Amendment, the recordings do not contain any such discussion relating to the individual defendants. In addition, the Court cautioned the jury that the tapes were only to be considered against the individual defendant heard on the tape.

The argument that Sheehy's possible assertion of Fifth Amendment guarantees was commented upon is also without merit. There is no conflict here as to the content of that recording. The dispute is limited to the effect of Sheehy's statement. Specifically, appellants claim that Sheehy's remark to Tauber that he would "let you know tomorrow how I'm gonna do it [approach the Grand Jury investigation]" constituted impermissible comment on his Fifth Amendment right to remain silent.

■■■ Cross-examination or comment by the prosecution on the exercise of the Fifth Amendment privilege is generally not permissible. *See United States v. Hale*, 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975). The problem with testimony or comments of that nature is that they are at best slightly probative as to a defendant's credibility, and usually extremely prejudicial in that the jury may equate assertion of the Fifth Amendment privilege with guilt. *Grunewald v. United States*, 353 U.S. 391, 424, 77 S.Ct. 963, 984, 1 L.Ed.2d 931 (1957), *United States v. Hale*, 422 U.S. at 180, 95 S.Ct. at 2138. In the present case, however, there is neither cross-examination into the defendants' prior assertion of the Fifth Amendment, nor comment by the prosecutor about prior silence. There is simply the indirect reference by Sheehy to several possible courses of conduct at his upcoming appearance before the Grand Jury. Unlike the case of direct comment on prior assertion of the privilege, we are faced with a vague and indirect reference to future conduct. We find little potential prejudice to defendant from the admission of that testimony. In *United States v. Craig*, 573 F.2d 455, 493 (7th Cir. 1977), this Court held that

a recording of a defendant's expression of intent to conceal his misdeeds during the ensuing investigation, even when commented upon by the prosecution, does not run afoul of Fifth Amendment guarantees against compelled self-incrimination. Given the vague and imprecise nature of Sheehy's statement, there is even less potential prejudice to the defendant in this case, and we cannot consider the admission of that statement improper.

Appellant Sheehy also claims that the admission of portions of the recorded conversations in which he discussed "cut[ting] a deal" constituted reversible error. Sheehy claims that this discussion contained a plea negotiation which is inadmissible under Rule 11(e)(6) of the Federal Rules of Criminal Procedure.[4] The dialogue in issue is as follows:

"Tauber: Do you think that if you could . . . do you think you could go an and cut a deal with Schenck [FBI Agent].

Sheehy: I doubt it, I doubt, well, I don't know, now, he said if you want to talk to me, I'm not promising you anything, you understand Warren?

Tauber: Yeah.

Sheehy: He come right out and told me that. 'I'm not promising you anything, but if you want to talk,' he says, 'maybe I can help ya,' you understand.

Tauber: Donald, lemme, lemme say this. At this point, my attitude is this and I, I, I don't know if it means anything to you or not. If it, if it helps you make a decision or not, I understand one, that you gotta, you, you, if you get stuck with something.

Sheehy: Yeah."

■■■ The government argues that the above discussion does not refer to or constitute a plea negotiation. We agree. In determining whether a discussion can be properly characterized as a plea negotiation, we must consider the accused's subjective expectation of negotiating a plea at the time of the discussion, and the reasonable-

---

4. While appellants do not rely on Rule 410 of the Federal Rules of Evidence, that Rule also .proscribes the admission of offers to plead guilty.

ness of that expectation. *United States v. Robertson*, 582 F.2d 1356, 1366 (5th Cir. 1978); *U. S. ex rel. Robinson v. Housewright*, 525 F.2d 988 (7th Cir. 1975). Here, Sheehy was talking to one of his fellow conspirators. The discussion taken as a whole indicates that Sheehy was considering numerous alternatives with regard to the upcoming investigation. At the time of the discussion he did not show any real expectation of negotiating a plea. At that time Sheehy had been approached by the FBI Agent Schenk with a general inquiry into Sheehy's willingness to cooperate. Sheehy's objective conduct in response, i. e., his failure to cooperate, or even inquire further into a plea negotiation, demonstrates a lack of any subjective expectation to negotiate a plea. Appellant's hindsight attempt to characterize his remarks as a plea negotiation cannot be supported.

## III. PREJUDICIAL REMARKS BY THE PROSECUTOR

■ Appellant O'Brien argues that the District Court erred in not granting a mistrial based on prejudicial closing remarks by the prosecutor. A number of instances of improper closing argument are cited as grounds for reversal. First, during his rebuttal closing argument, the prosecutor stated to the jury that O'Brien's trial counsel admitted that he (O'Brien) had given one false credit reference during the scam. Defendant claims that this statement was prejudicial because his trial counsel never admitted any such thing.

The government contends that this remark is simply a permissible inference from the evidence. The government notes that during closing argument O'Brien's counsel made reference to the absence of any witnesses who could say that O'Brien had given a credit reference for the Porter Company. Counsel then noted one exception as follows: "But one victim that I am going to believe says that they talked to Morgan O'Brien." This one witness was employed by one of the victim poultry suppliers.

While the use of the term "admission" seems a bit extreme, we believe the infer-

ence was a permissible one, and, in light of defense counsel's assertion as to the credibility of that witness, the remark was, to a certain extent, an invited response. *See United States v. Isaacs*, 493 F.2d 1124, 1165 (7th Cir. 1974).

■ O'Brien also argues that the government repeatedly misstated the evidence during closing arguments. During the defense closing, O'Brien's counsel pointed out contradictions between the testimony of two government witnesses, Tauber and Brown. The contradictions related to discrepancies each witness had concerning the extent and duration of their relationship with each other. Defense counsel then read a quotation from a page of the trial transcript, but inaccurately stated the page number. In rebuttal, government counsel noted the error in his argument and read the correct quotation. Thereafter, the prosecutor stated that defense counsel was "playing a little fast and loose with the facts in the case."

The Court, after an objection by defense counsel, instructed the jury that the phrase "fast and loose with the facts" was just a figure of speech, and instructed the prosecutor to amplify a correction of the record in that regard, at which point the government attorney stated he did not mean to suggest that the defense attorney had intentionally misrepresented the record, and that his (the prosecutor's) remark should not be considered.

Appellant O'Brien suggests the prosecutor's correction and the Court's curative remarks were insufficient. We disagree. The Court's curative remarks, together with the prosecutor's correction, were adequate to avoid any serious prejudice.

■ The third instance of prejudicial comment arises from the prosecutor's argument regarding appellants' phone records. At one point during the course of the trial, a side-bar conference took place concerning permissible inferences to be drawn from records of telephone calls made from and to numbers registered to various co-defendants. All parties agreed that this evidence

**1242**

was not to be used as evidence of who made the telephone calls. In his closing argument, the prosecutor stated that the telephone records were evidence of who made the calls, and to whom they were made. The Court interjected that such argument was improper because no inference could be drawn from the record concerning who made the phone calls. Government counsel then corrected his argument to reflect the side-bar agreement. In view of this correction and the trial court's admonition, such improper argument must be considered harmless.

■ The final argument with respect to improper comment is that the prosecutor's rhetorical question, "Where is Fred Appel?", amounted to comment on Morgan O'Brien's failure to testify. This argument is clearly without merit. In his opening statement, O'Brien's counsel stated that Fred Appel, an employee of O'Brien, would testify at the trial that Appel gave one of the credit references attributed to O'Brien. Appel never testified at trial. In view of defense counsel's statement in opening argument, the rhetorical question was clearly fair comment, and certainly cannot be viewed as a comment on O'Brien's failure to take the stand.

■ Appellant's alternative argument, that these remarks, when aggregated, so prejudiced appellant O'Brien as to deny him due process of law, must also be rejected. To the contrary, the District Court's handling of these instances, demonstrates a keen awareness and concern for appellant's due process rights, and a commendable example of how those rights are to be protected.

### IV. THE USE OF LEADING QUESTIONS

■ Finally, appellants argue that the repeated use of leading questions during direct examination of Warren Tauber denied them of their Sixth Amendment right to confrontation. Warren Tauber, having participated in the poultry scheme and the prior similar acts, was a crucial witness. The record reflects the use of leading questions at various stages during Tauber's direct examination. There were six objections by defense counsel, which were overruled.

Rule 611(c) of the Federal Rules of Evidence permits the Court to allow leading questions when "necessary to develop testimony." Once the District Judge exercises his discretion in that regard, appellants must establish an abuse of discretion to obtain a reversal. Appellants contend that the record reflects a pattern of leading questions "so suggestive and so numerous as to give the witness a false memory." Our review of the record reveals no such pattern, and we find no abuse of discretion in the Court's allowance of leading questions.

For the reasons set forth herein, we conclude the judgment should be affirmed.

AFFIRMED.