116 F.3d 1483
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Janie Smith HADEN, Defendant-Appellant
 No. 96-2950.
 United States Court of Appeals, Seventh Circuit.
 June 20, 1997.
 
 United States District Court for the Northern District of Indiana, South Bend Division, No. 95 CR 51; Robert L. Miller, Jr., Judge.
 Before POSNER, C.J., and BAUER and MANION, Circuit Judges.
 
 ORDER
 
 1
 In 1992 and 1993, Janie Smith Haden lived at 422 Pulaski Street, South Bend, Indiana. During this period, eleven women learned that Haden prepared tax returns out of her home and that she was often able to secure refunds for her customers. These women soon became Haden's clients. Some of them heard about Haden's work through Haden herself and others heard by word of mouth. Of the eleven women, two were employed, one was in college, and the remaining seven were unemployed, their only source of income coming from Aid to Families with Dependent Children (AFDC). Five of the seven unemployed customers made a point of telling Haden of their income status.
 
 
 2
 Each client provided Haden with her name and social security number. Of the eleven clients, we know how nine managed to get this information to Haden. Six clients gave the information directly to Haden, while three others went through a third party. Nine clients also gave Haden their children's names and social security numbers in order to claim unearned credit. None of the clients filled out their own tax forms. Instead, they relayed the basic information mentioned above and left the rest to Haden. None of them filled in their income or eligible return amounts either. Seven clients never even signed their filed returns. Two out of those seven signed their names on forms in Haden's presence, but these forms were not the same forms that were actually filed with the Internal Revenue Service ("IRS"). The income amounts on the forms that these two clients signed were lower than on the forms ultimately filed. The remaining four clients signed the forms that ultimately were filed, but at the time they signed the forms, the income or refund amount had not yet been entered.
 
 
 3
 The income and refund amounts entered on each of the eleven forms were incorrect. Each form listed "handy woman" as the filer's occupation. Finally, each tax return listed Haden's address as the address of the person filing the form. Attached to each of the filed tax returns were earnings statements which noted the amount of the filer's income and described the filer as a "handy woman"--doing housecleaning, cooking, ironing, running errands, baby sitting or shopping. Several of the earnings statements indicated that the work done was for the elderly and that the filer often received goods in return for her work. The individuals for whom these returns were filed did not know about these earnings statements and Haden never mentioned to any of them that such statements were required.
 
 
 4
 After the returns were filed, Haden met with eight of her clients in order to do some follow-up work. Four of these eight clients actually received refunds from the IRS. These refunds were sent to Haden's residence at 422 Pulaski, as was indicated on the filed tax returns. Each woman who received a refund first went to Haden's residence and then went with Haden to cash the check, whereupon Haden collected a portion of the refund as her fee.
 
 
 5
 Haden told four of her clients that she was being investigated by the IRS. Haden also instructed three of these same clients and another client not to cooperate if the IRS contacted them. Haden told them that they should not answer any IRS agent's questions, that they should not reveal that Haden prepared their returns, and that they should say that their jobs consisted of cooking and cleaning for the elderly.
 
 
 6
 On November 15, 1995, the Government filed an indictment against Haden in the United States District Court for the Northern District of Indiana, South Bend Division. Haden was charged with fourteen violations of 18 U.S.C. § 287. Each count alleged that Haden presented an individual tax return Form 1040 for calendar year 1992 in the name of a specific person; that the return constituted a false, fictitious, or fraudulent claim for a tax refund; and that Haden knew such claim to be false, fictitious, or fraudulent. Count fifteen alleged that Haden corruptly endeavored to obstruct or impede the due administration of the Internal Revenue Laws, in violation of 26 U.S.C. § 7212(a).
 
 
 7
 A jury trial began on March 25, 1996 and ended in a mistrial the next day. A second jury trial began on May 6, 1996, wherein the Government dismissed counts six and fourteen and part of count fifteen. The jury found Haden guilty on all counts except count 1. Haden was sentenced to forty-one months' imprisonment. In addition, she was ordered to pay a special assessment fee of $600, perform 300 hours of community service, and make restitution in the amount of § 24,720. Haden then filed this appeal.
 
 
 8
 On appeal, Haden contends that the district court failed to adhere to the Federal Rules of Evidence and therefore violated her Fifth Amendment right to due process and a fair trial. Specifically, she argues that certain trial witnesses did not have personal knowledge as to the matters about which they testified; that the Government's use of leading questions was improper; that the tax returns in this case constituted hearsay evidence; and that tax returns which lacked foundation were admitted into evidence. In addition, Haden maintains that there would not have been sufficient evidence to convict her if her counsel had made proper and timely objections to these violations of the Federal Rules of Evidence, and that because of her attorney's alleged lapses of diligence, Haden was denied the effective assistance of counsel.
 
 
 9
 We review admissions or exclusions of evidence for abuse of discretion. United States v. Payne, 102 F.3d 289, 294 (7th Cir.1996) (citations omitted). A district court's evidentiary rulings are entitled to substantial deference. United States v. Powers, 75 F.3d 335, 340 (7th Cir.1996) (citations omitted).
 
 
 10
 Federal Rule of Evidence 602 requires that witnesses testify only to matters about which they have personal knowledge. FED. R. EVID. 602(c); Powers, 75 F.3d at 340. In this case, the Government took each witness through a series of questions which included: how each witness heard about Haden; whether each witness met with Haden before Haden filed her tax return; what specific information each witness gave to Haden; whether the information on each witness' completed tax return was accurate; whether each witness recorded any inaccurate information herself; and what contact each witness had with Haden after Haden filed each witness' completed tax return. The witnesses in this case clearly had personal knowledge as to these issues. The witnesses clearly did not have personal knowledge as to whether, nor did they testify that, Haden wrote down the false information or forged their signatures. Instead, the witnesses testified only as to the circumstances surrounding the acts of Haden, and, from this circumstantial evidence, the jury inferred Haden's guilt.
 
 
 11
 Haden next argues that the Government asked several of Haden's clients an excessive number of leading questions and that the cumulative effect of such questions was to create the inference that Haden, and not any of her clients, falsely prepared the tax returns in question. Specifically, Haden maintains that even though Cora Woods testified that she had no idea how Haden's address was entered on Woods' return, the Government asked Woods if she allowed Haden to put her address on Woods' return. Haden further contends that the Government asked Theresa Jones if she gave Haden the typed earnings statement that was attached to Jones' return even after Jones said that she did not prepare the statement. Haden argues that the Government asked Shanessa Cunningham if Haden told her that she could still file a tax return even though Cunningham derived her income from AFDC. Finally, Haden believes that the Government should not have asked each of Haden's clients a series of questions as to whether the client gave the false information in the return after each witness indicated that she did not know the source of the false information.
 
 
 12
 Federal Rule of Evidence 611(c) allows the use of leading questions when "necessary to develop ... testimony." FED. R. EVID. 611(c); see also United States v. O'Brien, 618 F.2d 1234, 1242 (7th Cir.), cert. denied, 449 U.S. 858 (1980). The allowance of leading questions is within the trial court's discretion and the court's exercise of that discretion will not be reversed absent an abuse of discretion. O'Brien 618 F.2d at 1242.
 
 
 13
 Leading questions are those that suggest an answer for the witness. BLACK'S LAW DICTIONARY 1034 (4th ed.1968). In this case, most of the challenged questions were not leading. There were some leading questions posed to Haden's clients, but, for the most part, they were used to clarify ambiguities in witnesses' testimony. For example, the challenged questioning of Theresa Jones went as follows:
 
 
 14
 Q: you would, please, look back about three pages more, three pages farther back. There should be an earnings statement in there.
 
 
 15
 A. This here?
 
 
 16
 Q: Yes. Would you read that earnings statement for us, please?
 
 
 17
 A: "I were giving goods for services performed throughout the community for housing expenses, clothing, furniture, utilities paid for me, given appliances, amounted to be $7,552.00."
 
 
 18
 Q: Did you write that note, ma'am?
 
 
 19
 A: No.
 
 
 20
 Q: Did you tell Jean that you had earned this kind of money?
 
 
 21
 A: No.
 
 
 22
 Q: Do you have any idea where this note came from? Do you have any idea how that note got prepared?
 
 
 23
 A. I didn't prepare it. It was a typed statement--
 
 
 24
 Q: I'm sorry?
 
 
 25
 A. --whatever. A typed statement about what I earned.
 
 
 26
 Q: Yours was a typed statement?
 
 
 27
 A. Um-hum.
 
 
 28
 Q: I'm not sure I understand. You typed this statement and gave it to Jane? Is that what you are saying?
 
 
 29
 A. This is what--I'm saying this is not mine.
 
 
 30
 Q: This is not the statement you gave to Jane?
 
 
 31
 A: No.
 
 
 32
 Q. Very good. Did you work in 1992?
 
 
 33
 Yes, I did. Q: What was the total amount of your earnings in 1992 approximately? Do you recall? Do you recall what the typed statement that you gave Jean said?
 
 
 34
 THE COURT: I'm sorry. What did you say, ma'am?
 
 
 35
 A: As for cooking or baking cakes, that was about it.
 
 
 36
 Q: Do you recall the dollar amount?
 
 
 37
 A: About $600.00.
 
 
 38
 The Government generally asked each of Haden's clients a uniform line of questions. Rather than proceed through the entire return of every one of Haden's clients, the Government simply asked whether the witness filled out certain information on the completed return and, if not, whether the witness knew who entered such information. For example, the disputed questioning of Cora Woods went as follows:
 
 
 39
 Q: Is that the return that you had prepared there at Jean's house?
 
 
 40
 A: Yes.
 
 
 41
 Q: Is that your address up there at the top?
 
 
 42
 A: No.
 
 
 43
 Q: How about social security number? Is that accurate?
 
 
 44
 A: Yes, it is.
 
 
 45
 Q: Those are your children on there?
 
 
 46
 A: Yes, it is.
 
 
 47
 Q: Do you have any idea how that address got on there?
 
 
 48
 A: No, I don't.
 
 
 49
 Q: Did you tell Jane that it was all right if she put your address on the tax return?
 
 
 50
 A: My home address?
 
 
 51
 Q: I'm sorry. Did you tell Jane that it was all right if she put her address on the tax return?
 
 
 52
 A: No.
 
 
 53
 The purpose of the pattern of questions posed to Haden's clients was to rule out that Haden's clients themselves filled out certain false information that wound up on the returns which were ultimately filed with the IRS. This pattern of questions may have been repetitive, but it was posed to develop necessary testimony in an expedient fashion, rather than having each client supply a long, drawn-out narrative as to all of the information in her tax return. In any event, the pattern's cumulative effect did not go so far as to suggest Haden must have been the one who entered the false information on her clients' tax returns. There was sufficient circumstantial evidence to do that.
 
 
 54
 Haden also asserts that the Government's asking IRS Agent Dennis Young leading questions was overly suggestive. Agent Young testified that when he interviewed Haden, she admitted that she prepared many of the returns in question. However, Young could only specifically recall the name of one of Haden's clients. The Government showed Young his own notes from the Haden interview to refresh his memory and asked him some leading questions. We reiterate that Rule 611(c) allows the use of leading questions to develop a witness' testimony. We find nothing so suggestive about the use of leading questions in the context of refreshing a witness' ailing memory, especially when that witness is also given a copy of his own notes. In sum, we find no abuse of discretion in the trial court's allowance of any of the leading questions in issue.
 
 
 55
 Haden next contends that the testimony presented by her clients regarding the tax returns in question violated the hearsay rule because: (1) the returns were statements; (2) each witness testified that she did not enter the written assertions contained in the returns; and (3) the returns were offered to prove the truth of the matter asserted--that Haden entered the false information on the returns and submitted them with the intent to defraud the IRS. We find this argument unavailing. The returns were introduced not to prove the truth of their contents, but rather to point out inaccuracies contained therein. See United States v. Doughty, 460 F.2d 1360, 1363 n. 2 (7th Cir.1972) (concluding that estate tax return not introduced to prove the truth of anything stated in the return, but merely to show what in fact had been declared).
 
 
 56
 Haden also claims that hearsay abounds in the testimony of three of Haden's clients: Rachel Gary, Geraldine Irby, and Shanessa Cunningham. We likewise find this hearsay argument unavailing. Gary testified as follows:
 
 
 57
 Q: Did you have a 1992 tax return prepared, ma'am?
 
 
 58
 A: Yes.
 
 
 59
 Q: Can you tell us how that came about?
 
 
 60
 A: How it came about? Through--how it came about? Well, Jean used to come to Pearl's [another client's] house doing taxes and asked me did I want her to do my taxes and I told her I didn't work that year, and she said it was okay, you can do it. I was AFDC during that time. She said they can do it, a lot of people don't know about it, that you can do it. So, I told her okay. And I guess she told Jean I wanted it done. And later on Pearl came and got my kids' social security numbers and my card and she gave it to Jean and Jean done it, and I went to Jean's house to sign the tax paper.
 
 
 61
 (emphasis added). In the same vein, Irby testified:
 
 
 62
 Q: Can you tell us who prepared that return?
 
 
 63
 A: Ms. Jean Haden.
 
 
 64
 Q: How did the subject come up? Did she call you? Did you call her?
 
 
 65
 A: No. It was through another acquaintance.
 
 
 66
 Q: When you and Jean first talked about this income tax return, can you tell us how that happened?
 
 
 67
 A: Well, like I say, I was introduced to her by another acquaintance and she was telling me that she could get taxes--you know, at the time I wasn't working through the AFDC deal.
 
 
 68
 Finally, the exchange between Cunningham and the Government unfolded as follows:
 
 
 69
 Q: Did you have a 1992 income tax return prepared? Did somebody prepare a tax return for you?
 
 
 70
 A: Yes.
 
 
 71
 Q: Can you tell us how that came about?
 
 
 72
 A: I was talking with Junita King. She called me and told me that she knew someone that would fill out taxes for you, and she gave me Jean's number and I called her and she was telling me that I can give her my two kids [sic] names and social security numbers and I gave her that and she said would take care of everything on it.
 
 
 73
 Q: You called Jean Haden?
 
 
 74
 A: Yeah.
 
 
 75
 Q: How did you know her as?
 
 
 76
 A: Just Jean.
 
 
 77
 (emphasis added).
 
 
 78
 All of the above statements constitute admissions of a party defendant. Federal Rule of Evidence 801(d)(2) provides: "A statement is not ... [t]he statement is offered against a party and is ... the party's own statement in either an individual or representative...." The only possible ambiguity which we find lies in Gary's testimony. Gary's testimony contains an admission by Haden where Guy referred to Jean and then stated that "she asked me did I want her to do my taxes, and I told her I didn't work that year, and she said it was okay, you can do it." Gary goes on to say that" I was AFDC during that time. She said they can do it, a lot of people don't know about it, that you can do it. So, I told her okay." This part of the testimony likely refers to Haden. Gary then brings Pearl back into the conversation when she testifies, "And I guess she told Jean I wanted it done." Overall, it is not clear to whom Gary is referring when she simply says "she" or "her." However, Haden did not object to this testimony and had an adequate opportunity to cross examine Gary to dear up any confusion. As' to Irby and Cunningham, we can easily glean that the "her" to whom they refer is Jean Haden, and based on the record, we gather that many of Haden's clients knew her simply as "Jean."
 
 
 79
 Haden next claims that each of the twelve tax returns that were admitted into evidence lacked foundation because the returns did not satisfy the personal knowledge rule or the hearsay rule. She further argues that the returns lacked foundation because "the person who was the subject of the tax form exhibit did not witness the execution of the docment." We find these points to be weak. We have already established that Haden's clients testified as to information on the returns that was within their realms of personal knowledge and that the returns did not violate the hearsay rule. Moreover, at trial, the parties stipulated that if an IRS representative were to testify, he would state that each of the tax form exhibits was a tax return in the name of the individual specified for the year 1992. We have stated that "[t]he whole point of a stipulation is to avoid the time-consuming introduction of foundation evidence, when counsel for both sides know that the proponent can establish a foundation." United States v. Phillips, 914 F.2d 835, 841 (7th Cir.1990).
 
 
 80
 As to Haden's second point, when parties agreed to stipulations, it is not "unusual that the record is devoid of information showing who wrote the information in the exhibit, who transmitted the discrete piece of information in the exhibit, and when such information was transmitted." Philip, 914 F.2d at 841. These returns were also admitted without objection at trial.
 
 
 81
 Finally, Haden argues that there would not have been sufficient evidence to convict her if her counsel had made timely objections to leading questions, to inferences that may have arisen from the testimony which resulted from those leading questions, and to the introduction and admission of documents lacking foundation. In essence, this is a claim of ineffective assistance of counsel.[1]
 
 
 82
 We are troubled that the issue of ineffective assistance has been raised for the first time on appeal. In fact, the Government argues that Haden has waived this claim and for good reason--we have repeatedly stated that ineffective assistance of counsel claims are best handled at the district court level through a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure or through collateral relief available under 28 U.S.C. § 2255. United States v. Mojica, 984 F.2d 1426, 1452 (7th Cir.1993) (citations omitted). "[T]he district court, unlike the appellate court, has had the opportunity to observe counsel's performance firsthand." Id. (quoting United States v. Limehouse, 950 F.2d 501, 503 (7th Cir.1991), cert. denied, 504 U.S. 918 (1992)). Usually, at the appellate level, there has not been a chance to develop and include in the record evidence relating to ineffectiveness issues. Id. (citing United States v. Asubonteng, 895 F.2d 424, 428 (7th Cir.), cert. denied 494 U.S. 1089 (1990)). We do, however, have the discretion to decide ineffective assistance claims where the record is "sufficiently developed" to consider the issue, Id. (citing Asubonteng, 895 F.2d at 428), or where "both parties have asked us to resolve the matter, the question has been briefed and argued, and the entire record is before us," id. (quoting United States v. Acquilla, 976 F.2d 1044, 1053 (7th Cir.1992)).
 
 
 83
 Here, because only Haden has asked us to resolve the issue, our only concern is whether the record is "sufficiently developed" to decide the matter. The record before us is adequately developed for us to address this issue, as we will not have to consider evidence outside it to address Haden's claim. See, e.g. United States v. Mojica, 984 F.2d 1426, 1452 (7th Cir.1993).
 
 
 84
 It is presumed that Haden's counsel rendered adequate assistance and used reasonable professional judgment in making all significant decisions. United States v. Golden, 102 F.3d 936, 942 (7th Cir.1996) (citing Strickland v. Washington, 466 U.S. 668, 687-88 (1984)). To prevail on her claim of ineffective assistance, Haden must establish that her counsel's performance fell below "an objective standard of reasonableness" and that "but for" Haden's counsel's deficiencies, "the result of the proceeding would have been different." Id. (quoting Strickland, 466 U.S. at 687-88). We have already found Haden's claims as to leading questions, hearsay, and lack of foundation to be without merit. Thus, Haden's counsel's actions did not fall below an objective standard of reasonableness, and Haden cannot demonstrate that her counsel's actions prejudiced her, i.e, that but for her counsel's actions, the result of her trial would have been different. The circumstantial evidence against Haden was overwhelming.
 
 
 85
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Haden deems this a sufficiency of the evidence argument, but it is stated in such a way that it collapses into her ineffective assistance of counsel claim