984 F.2d 1426
 UNITED STATES of America, Plaintiff-Appellee,
v.
Antonio MOJICA, Giovanni Saldarriaga, Horacio Velasquez,
Jose Castaneda, James Velasquez, Rolando Candelo, Jaime
Concha, Henry Cordoba, Elmer Velasquez, Hernan Nestor
Bermudez, Gloria Concha, Julio Rodriguez, Marco Granada,
Hector Granada, Julio Velasco, and Diego Argaez,
Defendants-Appellants.
 Nos. 89-3809, 90-1140, 90-1178, 90-1277, 90-1278, 90-1313 to
90-1315, 90-1346, 90-1348, 90-1394, 90-1428,
90-1448, 90-1776, 90-2562 and 91-3266.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 12, 1992.
Decided Jan. 20, 1993.
Rehearing Denied Feb. 18, 1993 in
Nos. 90-1277 and 90-1313.
 
 1
 Barry R. Elden, Jerome N. Krulewitch (argued), Asst. U.S. Attys., Criminal Receiving, Appellate Div., Stephen Crocker, Asst. U.S. Atty., Criminal Div., Chicago, IL, for U.S.
 
 
 2
 John M. Cutrone (argued), Marvin J. Leavitt, Leavitt & Schneider, Chicago, IL, for Antonio Mojica.
 
 
 3
 Giovanni Saldarriaga, pro se.
 
 
 4
 John M. Cutrone (argued), Chicago, IL, for Horacio Velasquez, Rolando Candelo, Julio Velasco.
 
 
 5
 Horacio Velasquez, pro se.
 
 
 6
 William J. Stevens (argued), Chicago, IL, for Jose Castaneda.
 
 
 7
 Loraine A. Ray (argued), Chicago, IL, for James Velasquez.
 
 
 8
 Kenneth H. Hanson (argued), Chicago, IL, for Jaime Concha.
 
 
 9
 Joseph R. Lopez, John M. Cutrone (argued), Chicago, IL, for Henry Cordoba.
 
 
 10
 George S. Pfeifer (argued), Evanston, IL, for Elmer Velasquez.
 
 
 11
 Bradley J. Harris (argued), North Riverside, IL, for Hernan N. Bermudez.
 
 
 12
 Bernard P. Mulvaney, Jr., Oak Lawn, IL, David C. Thomas (argued), Chicago-Kent College of Law, Chicago, IL, for Gloria Concha.
 
 
 13
 John A. Meyer (argued), Chicago, IL, for Julio Rodriguez.
 
 
 14
 John T. Theis (argued), Nathan Diamond-Falk, Chicago, IL, for Marco Granada.
 
 
 15
 Robert G. Clarke, Glenn Seiden (argued), Seiden & Associates, Chicago, IL, for Hector Granada.
 
 
 16
 Julio Velasco, pro se.
 
 
 17
 Diego Argaez, pro se.
 
 
 18
 Before CUMMINGS and MANION, Circuit Judges, and GORDON, Senior District Judge.[1]
 
 
 19
 MYRON L. GORDON, Senior District Judge.
 
 
 20
 The appellants are fifteen defendants who have been convicted of various narcotics offenses. They raise a number of challenges to their convictions and sentences. Because we find no merit in the challenges to the convictions of the appellants, the convictions will be affirmed. However, we conclude that appellants James Velasquez and Julio Rodriguez are entitled to resentencing.
 
 I. BACKGROUND
 
 21
 In January 1989, a grand jury returned a 101 count indictment against 27 defendants charging each of them with having conspired to distribute cocaine between March 1988 and January 1989 in violation of 21 U.S.C. § 846. In addition, the indictment charged certain of the defendants with distributing cocaine in violation of 21 U.S.C. § 841, using the telephone to facilitate the distribution of cocaine in violation of 21 U.S.C. § 843(b), and the enhanced offense of distributing cocaine within 1000 feet of a school in violation of 21 U.S.C. § 845a. Of the twenty-seven original defendants, fifteen ultimately went to trial (collectively, the "trial defendants"): Giovanni Saldarriaga, Horacio Velasquez, Jose Castaneda, James Velasquez, Rolando Candelo, Jaime Concha, Gloria Concha, Henry Cordoba, Elmer Velasquez, Hernan Nestor Bermudez, Adriana Sandoval, Julio Rodriquez, Marco Granada, Hector Granada and Renzo Soto.
 
 
 22
 Three of the original twenty-seven defendants, Antonio Mojica, Julio Velasco and Diego Argaez waived their right to a jury trial and entered guilty pleas. Antonio Mojica pled guilty to distributing cocaine and the enhanced offense of distributing cocaine within 1000 feet of a school; Julio Velasco and Diego Argaez pled guilty to the conspiracy charge.
 
 
 23
 The evidence used against the trial defendants was obtained through the use of a government informant, Henry Olave, and an undercover agent, Sabina Carlson. Through Mr. Olave and Ms. Carlson the government infiltrated a large scale cocaine distribution network in Chicago. The evidence presented at trial consisted of the testimony of Mr. Olave and Ms. Carlson, taped telephone and in-person conversations, photographs, telephone records and physical evidence such as 6 1/2 kilograms of cocaine, guns, pagers and mobile phones.
 
 
 24
 On September 18, 1989, the jury returned guilty verdicts against fourteen of the fifteen trial defendants on the conspiracy charge; Renzo Soto was acquitted of this charge. In addition, certain trial defendants were convicted of distributing cocaine, using the telephone to facilitate the distribution of cocaine and the enhanced offense of distributing cocaine within 1000 feet of a school.
 
 
 25
 Renzo Soto and Adriana Sandoval have not appealed any of their convictions. Diego Argaez filed a notice of appeal with this court on September 26, 1991. However, because Mr. Argaez has failed to file a brief presenting his arguments to the court and has failed to respond to two orders issued by this court directing him to explain his failure to file a brief (orders of December 30, 1991, and March 4, 1992), his conviction and sentence will be summarily affirmed. The remaining thirteen trial defendants, along with Antonio Mojica and Julio Velasco, have each lodged challenges to their convictions or sentences, or both. Despite the large number of objections advanced by the defendant-appellants, not all of them justify (nor will receive) detailed analysis by this panel.
 
 II. SUFFICIENCY OF THE EVIDENCE
 
 26
 Thirteen appellants jointly argue that the government failed to prove the existence of a single, ongoing conspiracy as charged in the indictment. (Appellants Mojica and Velasco do not join in this argument.) Also, seven of the appellants separately argue that the government failed to establish their participation in the single conspiracy. We will first address the joint contention that the government failed to establish the existence of a single wholesale conspiracy to distribute cocaine. Next, we will address each of the seven appellants' individual challenges.
 
 A. Joint Challenge
 
 27
 In their joint brief, the appellants argue that there was a fatal variance between the government's charge in the indictment--an ongoing single conspiracy--and its proof at trial--multiple, narrower conspiracies. That is, these appellants argue that the government's evidence failed to establish that they shared a "common goal" and maintain that the relationship among them amounted to nothing more than mere association. Moreover, the appellants contend that while some of them may have had knowledge that a number of their co-appellants were in the drug trade, any contact between the appellants was founded on legitimate business reasons.
 
 
 28
 A claim of fatal variance "amounts to a challenge to the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy." United States v. Townsend, 924 F.2d 1385, 1389 (7th Cir.1991). Determining the existence of a single conspiracy is a question of fact for the jury; thus, "the jury gets first crack at deciding 'whether there is one conspiracy or several when the possibility of a variance appears.' " United States v. Paiz, 905 F.2d 1014, 1019 (7th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2278, 114 L.Ed.2d 729 (1991) (quoting United States v. Percival, 756 F.2d 600, 609 (7th Cir.1985)). When evaluating a challenge to the sufficiency of the evidence, "[t]he test is whether, after viewing the evidence in the light most favorable to the government, 'any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.' " United States v. Aguilar, 948 F.2d 392, 395 (7th Cir.1991) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).
 
 
 29
 A material variance from an indictment charging a single conspiracy does not exist even if the evidence arguably established multiple conspiracies where a reasonable trier of fact could have found beyond a reasonable doubt the existence of a single conspiracy charged in the indictment. Townsend, 924 F.2d at 1389 (citing United States v. Prince, 883 F.2d 953, 959 (11th Cir.1989)). The government is not required to demonstrate the existence of a formal agreement to conspire; it may rely upon "circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct...." United States v. Sullivan, 903 F.2d 1093, 1098 (7th Cir.1990) (quoting United States v. Redwine, 715 F.2d 315, 320 (7th Cir.1983), cert. denied sub nom. Strong v. United States, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984)).
 
 
 30
 Where a jury may reasonably infer a single agreement among the defendants from the evidence of the drug transactions proffered by the government, the jury verdict must be upheld. Townsend, 924 F.2d at 1390. That is, "if the evidence indicates that a defendant must have known that his actions were benefitting a larger conspiracy, he may be said to have joined the conspiracy." Townsend, 924 F.2d at 1390.
 
 
 31
 "A single conspiracy exists '[i]f there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy.' " Paiz, 905 F.2d at 1020 (quoting United States v. Sababu, 891 F.2d 1308, 1322 (7th Cir.1989)). On the other hand, " '[Multiple] conspiracies exist when each of the conspirators' agreements has its own end, and each constitutes an end in itself.' " Paiz, 905 F.2d at 1020 (quoting Sababu, 891 F.2d at 1322).
 
 
 32
 A review of the record demonstrates that the evidence was more than sufficient to support the jury's finding of a single conspiracy. The record establishes that the appellants enjoyed an ongoing cooperative relationship which facilitated the success of a common venture--a wholesale drug distribution network. The record is replete with evidence of the appellants' cooperation and interrelations. There was evidence that the appellants regularly referred potential customers to one another. Also, the appellants had a detailed and accurate knowledge of the drug trafficking activities of one another, including such details as the dates and times of transactions, and the quality, quantity and prices of drugs that were available. Such evidence is highly probative of the existence of an agreement to carry out the objectives of the conspiracy. See United States v. Grier, 866 F.2d 908, 927 (7th Cir.1989) (knowledge of a codefendant's drug dealing activities along with a close personal relationship are relevant to the existence of a single conspiracy).
 
 
 33
 The record also includes evidence of the appellants' reliance upon one another, rather than one source, to ensure the availability of a supply of cocaine for their customers. The appellants argue that the existence of multiple sources of cocaine, rather than a solitary source, contradicts the existence of a single conspiracy. However, the existence of a single conspiracy does not depend upon the number of component parts of the "organizational chart," but rather depends upon an agreement to cooperate among all the component parts. See Townsend, 924 F.2d at 1391-92.
 
 
 34
 Further, the record contains evidence of the appellants' mutual trust and interest in achieving the goal of the conspiracy including a willingness to "front" cocaine to one another and to collect debts for one another. The government also presented evidence which established that the relationship among the appellants was ongoing and exclusive. The continuing nature of the appellants' relationship was evidenced by the fact that the appellants each lived in the same small Colombian community where a number of the appellants owned businesses. (Jaime and Gloria Concha owned a jewelry store, as did Hector Granada, Nestor Bermudez owned a "knick-knack" store, Horacio Velasquez owned an automobile repair garage, and Rolando Candelo had a radio program on a local spanish-speaking radio station.)
 
 
 35
 The appellants' relationship was also marked by a high degree of exclusivity. Such exclusivity was evidence by the fact that the appellants refrained from dealing with non-Colombians and were reluctant to deal with individuals whom they did not know. Also, the appellants used a common code that was unique to their association insofar as it was comprised of terms commonly used in the jewelry business. For example, various appellants referred to a kilogram of cocaine as a "watch" or a "diamond" and a half kilogram as a "bracelet." The use of a common code, especially a code comprised of terms not ordinarily used by drug dealers, supports the inference that the appellants conspired together. See Townsend, 924 F.2d at 1395, n. 5 (citing Grier, 866 F.2d at 922).
 
 
 36
 Viewing this evidence in a light most favorable to the government, we believe that the evidence is sufficient to support the jury's determination that the appellants engaged in an ongoing single conspiracy.
 
 B. Individual Challenges
 
 37
 In their individual briefs, seven of the fifteen appellants separately argue that the evidence was insufficient to demonstrate his or her participation in the conspiracy. An essential element of a conspiracy is a "participatory link" between the conspiracy and the defendant. United States v. Navarez, 954 F.2d 1375, 1380-81 (7th Cir.1992). The government has met its burden with respect to this element when it presents sufficient evidence demonstrating that the "defendant knew of the conspiracy and that he [or she] intended to join and associate himself [or herself] with its criminal design and purpose." Navarez, 954 F.2d at 1381 (quoting United States v. Auerbach, 913 F.2d 407, 415 (7th Cir.1990)).
 
 
 38
 When evaluating a challenge to the sufficiency of the evidence to connect a particular appellant to a conspiracy, the test is "substantial evidence" rather than "slight evidence" or a "slight connection." United States v. Durrive, 902 F.2d 1221, 1228 (7th Cir.1990). However, circumstantial evidence may support a conspiracy conviction. Navarez, 954 F.2d at 1381.
 
 
 39
 We shall analyze the appellants' individual challenges to the sufficiency of the evidence in the order in which the appellants are named in the case caption.
 
 1. Jose Castaneda
 
 40
 Mr. Castaneda contends that although a conspiracy may have existed, he had no knowledge of it or intent to join it. That is, Mr. Castaneda suggests that the evidence, at best, establishes only that he agreed to make a single delivery of cocaine to Socorro Granada, appellant Jaime Concha's sister.
 
 
 41
 According to the government, the evidence clearly established that Mr. Castaneda acted in concert with members of the conspiracy--namely, Gloria Concha, Jaime Concha and Marco Granada--to advance a common objective: the wholesale distribution of cocaine. In addition, the government contends that Mr. Castaneda possessed knowledge of the conspiracy and intended to join it.
 
 
 42
 We believe that there was substantial evidence--both direct and circumstantial--in support of the government's position. On April 21, 1988, Mr. Castaneda delivered a half kilogram of cocaine to Socorro Granada which was ultimately to be purchased by Mr. Olave, the confidential informant, and Ms. Carlson, the undercover agent. Prior to the delivery, Socorro Granada informed Mr. Olave and Ms. Carlson that while she typically worked with her brother Jaime Concha when she participated in cocaine deals, she was aware of Mr. Castaneda's course of dealing and advised them that Mr. Castaneda, known to her as "El Tio," was strictly business and would not tolerate her being late. When they arrived at the prearranged location, Socorro Granada told Mr. Olave and Ms. Carlson that Mr. Castaneda did not want to be seen by them. Ms. Granada's statement suggests that Mr. Castaneda was aware that the sale did not end with Ms. Granada.
 
 
 43
 In October 1988, Mr. Castaneda approached Mr. Olave while Mr. Olave was working on Mr. Castaneda's car and suggested that Mr. Olave contact him if he had any customers interested in buying any cocaine. In addition, Mr. Castaneda was mentioned by Marco Granada, a co-conspirator, to Mr. Olave, as a possible source of cocaine and by the Conchas as someone who owed them money. When Mr. Castaneda was arrested, a stash box, portable phone and a pager were found in his possession.
 
 
 44
 Thus, contrary to Mr. Castaneda's assertion, the evidence, although largely circumstantial, strongly indicates that Mr. Castaneda's involvement with the conspiracy went beyond an isolated sale of cocaine to Socorro Granada. In fact, the evidence indicates that Ms. Socorro (who admitted her involvement with the Conchas) and Mr. Castaneda had dealt with each other on previous occasions: she knew his course of dealing, and he was aware that she was going to resell the cocaine. The evidence also showed that Mr. Castaneda was interested in carrying out the objectives of the conspiracy: he offered to sell drugs to Mr. Olave and possessed tools of the trade including a pager which promotes accessibility and a stash box which is utilized for transporting large quantities of cocaine.
 
 
 45
 More notably, the evidence demonstrates a link between Mr. Castaneda and other co-conspirators, namely, Marco Granada and the Conchas. Indeed, the evidence suggested that his relationship with the Conchas involved a degree of trust insofar as the Conchas had fronted cocaine to him. Accordingly, viewing the direct and circumstantial evidence in a light most favorable to the government, we cannot say that there was insufficient evidence upon which a jury could reasonably infer that Mr. Castaneda was fully aware of the existence of the conspiracy and intended to further its purpose.
 
 2. James Velasquez
 
 46
 James Velasquez was found guilty of conspiring to distribute cocaine and aiding and abetting the distribution of 250 grams of cocaine. Mr. Velasquez challenges his conspiracy and aiding and abetting convictions on a single ground: that the evidence failed to establish his knowledge and intent to participate in the conspiracy or to distribute the 250 grams of cocaine. That is, he contends that the evidence proffered by the government merely established that he was associated with members of the conspiracy through his familial ties with "most of the co-defendants" and that he was present at the scene of the crime. His attack, as to both convictions, is aimed primarily at the credibility of the government witnesses, namely, Ms. Carlson and Mr. Olave.
 
 
 47
 The government maintains that the record discloses that Mr. Velasquez, through his involvement in counter-surveillance, had knowledge of the general aims of the conspiracy and was an active participant therein. In addition, the government asserts that the evidence also demonstrates that he knowingly and intentionally aided and abetted the distribution of a quarter kilogram of cocaine on June 21, 1988.
 
 
 48
 Like the crime of conspiracy, the elements of aiding and abetting the distribution of cocaine include "association" and "participation". United States v. Gonzalez, 933 F.2d 417, 433 (7th Cir.1991) (citing United States v. Valencia, 907 F.2d 671, 677 (7th Cir.1990)). To prove "association," the government must establish that the defendant "either knowingly or intentionally aided and abetted...." Gonzalez, 933 F.2d at 444 (quoting Valencia, 907 F.2d at 680). "Participation" requires evidence to establish that the defendant engaged in some affirmative conduct to aid in the success of the venture; "a high level of activity need not be shown...." Gonzalez, 933 F.2d at 443 (quoting United States v. Beck, 615 F.2d 441, 448 (7th Cir.1980)).
 
 
 49
 As a preliminary matter, Mr. Velasquez argues that the testimony of Mr. Olave and Ms. Carlson was not properly considered by the jury because such testimony was uncorroborated and contradicted by other evidence. To the extent that Mr. Velasquez's argument amounts to a challenge to the credibility of the government's witnesses and the weight of their testimony, it is without merit. It is not the task of this appellate court to reconsider the evidence or assess the credibility of the witnesses. Paiz, 905 F.2d at 1021; United States v. Whaley, 830 F.2d 1469, 1472 (7th Cir.1987), cert. denied, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).
 
 
 50
 Viewing the evidence in a light most favorable to government, we find that Mr. Velasquez's characterization of his association with the members of the conspiracy is belied by the evidence. On June 21, 1988, Mr. Olave and Ms. Carlson went to a garage owned by Horacio Velasquez in order to purchase a quarter kilogram of cocaine from Jorge Suarez. Shortly after their arrival, Mr. Olave and Ms. Carlson left with Mr. Suarez in a van. Meanwhile, Mr. Velasquez was observed by members of the Drug Enforcement Agency (DEA) surveillance team behind the garage acting as a look-out. As a result of his efforts, Mr. Velasquez spotted the DEA surveillance car that was following Mr. Suarez in the van.
 
 
 51
 When Mr. Suarez returned to the garage with Mr. Olave and Ms. Carlson, Mr. Velasquez informed them that they had been followed and described the DEA vehicle. Further, Mr. Velasquez informed them that he believed that appellant Marco Granada had brought the "heat" to the garage on a previous occasion when he had been followed in the same van. Because of Mr. Velasquez's warning, Mr. Suarez recommended that the deal be completed at his apartment rather than at the garage. At Mr. Velasquez's suggestion, they temporarily abandoned the van and used Mr. Suarez's car to transport them to the new location.
 
 
 52
 During the drive to Mr. Suarez's apartment, Mr. Velasquez again acted as a look-out in the back seat of the car. When the group arrived at their destination, Mr. Velasquez remained outside the apartment for a short while to ensure that they had not been followed by the police. However, when Rudolfo Velasquez arrived at the apartment, he informed the group, including James Velasquez, that he had seen a police car nearby. At this point, Rudolfo Velasquez and James Velasquez were told that the "deal" would be rescheduled if they confirmed that police were nearby. Indeed, they did confirm the presence of the police, and the deal was ultimately rescheduled. Approximately one week later, Mr. Velasquez again was identified by a DEA surveillance team allegedly engaging in "counter-surveillance" outside Mr. Suarez's apartment building.
 
 
 53
 This evidence contradicts Mr. Velasquez's contention that he had no knowledge of the conspiracy and was merely acting as a look-out on one isolated occasion. His knowledge of Marco Granada's drug dealings and previous involvement with the police at the same garage, his repeated role in counter-surveillance, Suarez's statement to him that the deal would be rescheduled if the police were present, and his relationship with most of the co-defendants support the jury's inference that Mr. Velasquez knew of the conspiracy and intended to join it.
 
 
 54
 Although Mr. Velasquez accurately points out that participation in counter-surveillance, without more, is insufficient to establish one's membership in the conspiracy, Mr. Velasquez's involvement went beyond mere counter-surveillance. See United States v. Villegas, 911 F.2d 623 (11th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991). Mr. Velasquez's awareness of the purpose of the conspiracy is verified in the apprehension enunciated in his statement to Mr. Suarez, Ms. Carlson and Mr. Olave concerning the possibility that the van had been identified by the police and by the fact that he was present when Mr. Suarez notified everyone that the deal would be rescheduled if the police were nearby. In addition, Mr. Velasquez's interest in the success of the overall operation is confirmed by the fact that he took steps to stop the drug transaction from going forward as planned when he detected the presence of the police. The evidence also indicates that he acted as a look-out on more than one occasion.
 
 
 55
 We believe that such evidence amply supports an inference that Mr. Velasquez was aware of the general aims of the conspiracy and agreed to act as a look-out in order to carry out the objectives of the conspiracy. Based upon this conclusion, and in view of the evidence, we find that a reasonable jury could also have found that Mr. Velasquez affirmatively aided the distribution of a quarter kilogram of cocaine on June 21, 1988, and properly found him guilty of aiding and abetting the distribution of cocaine. See Gonzalez, 933 F.2d at 443.
 
 3. Rolando Candelo
 
 56
 Rolando Candelo argues that the proof offered by the government showed nothing more than that he made one isolated sale to Mr. Olave and Ms. Carlson. On the other hand, the government characterizes Mr. Candelo as an experienced member of the conspiracy whose interest went beyond the immediate sale. The evidence supports the government's view.
 
 
 57
 Mr. Candelo, like Mr. Velasquez, asks this court to reject the testimony of the government's witnesses on the ground that it misinterprets various statements that he made to the witnesses. As we have previously noted, it is not our task to reevaluate determinations of the weight of evidence or the credibility of witnesses. See Paiz, 905 F.2d at 1021. Thus, we decline to accept Mr. Candelo's invitation and will proceed to determine whether the record contains sufficient evidence to support the jury's verdict.
 
 
 58
 The record reveals that Mr. Olave was first introduced to Mr. Candelo in July 1988 by Giovanni Saldarriaga at Mr. Saldarriaga's record store. Mr. Olave testified that after the introductions Mr. Saldarriaga stated that Mr. Candelo would "give [Mr. Olave] some work ... mechanic's work as well as purchasing some dope." In fact, "some work" was again offered to Mr. Olave later in July by Mr. Candelo himself when Mr. Olave was working on Mr. Candelo's car. At this time, Mr. Candelo offered to sell cocaine to Mr. Olave so that Mr. Olave could resell the narcotics to his customers. Consequently, the two exchanged pager numbers. Thereafter, Mr. Saldarriaga encouraged Mr. Olave to take Mr. Candelo up on his offer when Mr. Saldarriaga was unable to provide Mr. Olave with any cocaine. On August 3, 1988, a sale of 250 grams of cocaine was perfected between Mr. Candelo, Mr. Olave and Ms. Carlson.
 
 
 59
 Mutuality of interest between Mr. Candelo and Mr. Saldarriaga, an active member of the conspiracy, is evidenced by the fact that Mr. Saldarriaga took a number of steps to encourage a "business" relationship between Mr. Candelo and Mr. Olave. In addition, Mr. Candelo's knowledge of the drug ring's goals and his desire to carry them out can be inferred from the fact that he shared information of his trade practices with Mr. Olave and gave him advice to guarantee the success of their operation. For instance, when Mr. Candelo and Mr. Olave were planning the transaction, Mr. Candelo advised Mr. Olave that someone other than Mr. Olave should pick up the cocaine personally to avoid any problems. Mr. Candelo's participation in a recorded telephone conversation with Jaime Concha and Hector Granada in which Jaime Concha asked Mr. Granada how it went for him on his two-day trip to the Bahamas and Disney World and inquired as to collection matters supports a reasonable inference that Mr. Concha was aware of his activities. Furthermore, Mr. Olave testified that Mr. Concha was involved in transporting drugs from Florida. Thus, it is not unreasonable for the jury to have inferred that Mr. Concha's inquiry regarding Mr. Granada's two-day trip to Disney World, located in Florida, was actually an inquiry concerning drug trafficking.
 
 
 60
 Based on all of this evidence and all reasonable inferences drawn therefrom, the jury had a sufficient basis to conclude beyond a reasonable doubt that Mr. Candelo was a knowing participant in the single cocaine distribution conspiracy.
 
 4. Jaime Concha
 
 61
 Jaime Concha attempts to trivialize the evidence offered against him by arguing that it shows no more than a buyer-seller relationship between him, as the seller, and various individuals, as buyers. We agree with the government that Mr. Concha oversimplifies the proof against him and his role in the conspiracy.
 
 
 62
 It is true, as Mr. Concha asserts, that a "relationship of buyer-seller absent any prior or contemporaneous understanding beyond the mere sales agreement does not prove a conspiracy." Townsend, 924 F.2d at 1394 (emphasis in original). However, we believe that there was substantial evidence which confirmed that Mr. Concha's interest transcended the individual sale.
 
 
 63
 In addition to the fact that the evidence disclosed that Mr. Concha himself sold narcotics to Mr. Olave and to a number of the appellants (Hector Granada, Marco Granada, Horacio Velasquez and Henry Cordoba), the evidence also reveals that Mr. Concha referred Mr. Olave to other conspirators when his own supply was drained. For instance, the evidence discloses that on September 28, 1988, Mr. Concha referred Mr. Olave to Horacio Velasquez and Elmer Velasquez when he could not fulfill his offer to sell a kilogram of cocaine to Mr. Olave. Mr. Concha recommended Mr. Velasquez because he was aware that Mr. Velasquez had 500 grams to sell and also suggested that Marco Granada be contacted because he too "could make a fast deal." This evidence suggests a common purpose, and it also illustrates that Mr. Concha was aware, in detail, of the drug dealings of the other conspirators.
 
 
 64
 Mr. Concha's significance to the drug ring and his awareness of its overall purpose is verified by the fact that he was often contacted by other conspirators during the course of their deals. Specifically, on September 9, 1988, when Henry Cordoba was having difficulty locating a kilogram of cocaine for Mr. Olave, he telephoned Mr. Concha. Having failed to locate the desired cocaine, Hector Granada, Henry Cordoba and Mr. Olave tried again on September 13, 1988. A call was again made to Mr. Concha, this time by Hector Granada, in which Mr. Granada informed Mr. Concha of the time and location of the transaction.
 
 
 65
 The evidence offered by the government also indicates that mutual trust existed between Mr. Concha and the other appellants. When Mr. Olave purchased drugs from Horacio Velasquez on July 27, 1988, he was informed that the money should be given to Mr. Concha. Similarly, when Elmer Velasquez sold a quarter kilogram to Mr. Olave, he directed Mr. Olave to drop off the money at Hector Granada's house, where he was at the time, or at Mr. Concha's house. Use of Mr. Concha's house or his jewelry store as a "drop-off" site for drug payments cogently illustrates that Mr. Concha was trusted and belies Mr. Concha's assertion that his interest did not go beyond his own individual sale agreements. Furthermore, the fact that Mr. Concha utilized Horacio Velasquez's garage and Hector Granada's jewelry store as locations for his transactions illustrates that the trust was mutual.
 
 
 66
 A desire to further the purposes of the conspiracy is evident from the fact that Mr. Concha fronted cocaine to Mr. Castaneda and Diego Argaez and that he in turn was fronted cocaine by Julio Velasco. Mr. Concha's awareness of the purposes underlying the conspiracy is validated in the frequency with which members of the conspiracy discussed drug activities and actually engaged in the sale of drugs in the Concha's jewelry store. In addition, his knowledge and use of the unique code comprised of jewelry terminology supports an inference that he was a member in the exclusive drug ring.
 
 
 67
 In view of this abundant evidence, we are confident that a reasonable jury could properly find that Mr. Concha was a knowing and integral member of the single conspiracy.
 
 5. Hernan Nestor Bermudez
 
 68
 Hernan Nestor Bermudez was convicted of participating in the conspiracy and of one count of attempted distribution and one count of completed distribution of cocaine. He contends that the evidence was insufficient as to each of these convictions. We disagree. Although purporting to challenge all three of his convictions, Mr. Bermudez only focuses on his conspiracy conviction in his brief. We will follow his lead.
 
 
 69
 The evidence reveals that on September 27, 1988, Mr. Bermudez, also known as "El Negro," attempted to deliver a half kilogram of cocaine to Julio Velasco who had arranged to sell the drugs to Mr. Olave for $9,500. Prior to Mr. Bermudez's arrival at the prearranged location, Mr. Velasco explained, in detail, how he and "El Negro" handled the cocaine. Specifically, he explained to Mr. Olave their weighing and packaging procedure and informed him that payment could be made to him or to Mr. Bermudez, it was "the same thing."
 
 
 70
 When Ms. Carlson approached Mr. Bermudez to obtain the cocaine, the latter told her not to talk to him but to keep walking because he had observed police officers nearby. In fact, Mr. Bermudez's apprehension concerning the presence of the police officers caused him ultimately to abort the deal. The next day, Giovanni Saldarriaga, who had not directly participated in the deal, explained to Mr. Olave that Mr. Bermudez had scratched the deal because he had been fearful of the police. After meeting with Mr. Bermudez in his store on September 29, 1988, Mr. Velasco apprised Mr. Olave that approximately 850 grams of cocaine were available for sale and that the supply had been moved to Mr. Bermudez's house. Mr. Velasco later advised Mr. Olave that Mr. Bermudez had promised to deliver approximately 450 grams of cocaine to them. That evening, Adriana Sandoval, Mr. Bermudez's wife, delivered 400 grams of cocaine to Mr. Olave.
 
 
 71
 The above series of events illustrates that Mr. Bermudez had knowledge of and agreed to participate in the wholesale cocaine distribution conspiracy. Mr. Velasco's statements to Mr. Olave regarding payment and the method of operation between himself and Mr. Bermudez evinces an ongoing relationship between Mr. Velasco, a co-conspirator, and Mr. Bermudez. Moreover, Mr. Velasco's statement that it was immaterial who received the payment supports an inference that their relationship entailed commonality of purpose and trust.
 
 
 72
 Mr. Bermudez's knowledge of the overall goal of the conspiracy and his stake in the outcome was demonstrated by his conduct on September 28, 1988 when he detected the presence of the police. Notwithstanding the aborted deal on September 28, 1988, Mr. Bermudez was ready and willing to try again the next day. Moreover, it is apparent that Mr. Bermudez was linked to Mr. Saldarriaga, a faithful participant in the conspiracy, insofar as Mr. Saldarriaga had detailed knowledge of the aborted transaction within a short time of its occurrence.
 
 
 73
 Thus, we conclude that the jury's determination that Mr. Bermudez knowingly and intentionally participated in the conspiracy was not improper. We are also persuaded that the evidence was sufficient to demonstrate that Mr. Bermudez directly participated in the attempted distribution on September 28, 1988, and in the completed distribution on September 29, 1988.
 
 6. Gloria Concha
 
 74
 The government argued that, like her husband Jaime Concha, Gloria Concha was integral to the wholesale drug distribution conspiracy. Ms. Concha challenges the sufficiency of the evidence as to her convictions for conspiring to distribute cocaine, aiding and abetting the distribution of cocaine, and use of the telephone to facilitate the distribution of cocaine. She insists that the record shows only that she was fearful of her husband's activities and was merely casually associated with the conspirators through her husband. The record contradicts her assertion as to each of the convictions.
 
 
 75
 Ms. Concha initially asks this court to reverse her conspiracy conviction on the ground that the evidence against her was wholly circumstantial. The existence of direct evidence is not essential to prove one's membership in a conspiracy where there is circumstantial evidence which supports, beyond a reasonable doubt, an inference that an individual agreed to participate in the conspiracy. United States v. Duarte, 950 F.2d 1255, 1259 (7th Cir.1991). Here, the evidence solidly supports such an inference.
 
 
 76
 It is undisputed that Ms. Concha was linked with essential members of the drug conspiracy and that she had knowledge of the overall purpose of the conspiracy. In fact, in her brief, Ms. Concha readily admits that she had knowledge of her husband's narcotics activities and those of his family and friends. Thus, what is at issue is Ms. Concha's intent to participate in the conspiracy.
 
 
 77
 Mr. Olave testified that in April 1988, Ms. Concha instigated a meeting among herself, her husband and Mr. Olave in which she and her husband discussed with Mr. Olave various "safe routes" to and from Florida for the purpose of transporting drugs. According to Mr. Olave, Ms. Concha and her husband also questioned him about his previous participation in the drug trading business. Her role in instigating such a meeting and the breadth of her knowledge regarding the drug trading operation substantiate the government's contention that Ms. Concha intentionally and voluntarily participated in the conspiracy.
 
 
 78
 Ms. Concha's personal involvement in transactions with Mr. Olave and with members of the conspiracy also supports the government's assertion that Ms. Concha personally and intentionally participated in the successful operation of the conspiracy. For instance, after Mr. Olave's first transaction with Jaime Concha, Mr. Olave had a telephone conversation with Ms. Concha in which they discussed a second purchase of one kilogram of cocaine. During the conversation, Ms. Concha asked Mr. Olave to come to her house so that they could discuss the future transaction in detail and she urged him not to discuss the matter any further over the telephone.
 
 
 79
 Mr. Olave testified that he had additional telephone conversations with Ms. Concha concerning the planned drug deal during August 1988. Specifically, on August 22, 1988, when Mr. Olave called the Concha's jewelry store to obtain information regarding the impending drug deal, Ms. Concha encouraged Mr. Olave to come over to the jewelry store. When Mr. Olave spoke to Jaime Concha, he too encouraged Mr. Olave to come to the store and informed him that he had the cocaine. When he arrived at the store Jaime Concha had already left. Nevertheless, Ms. Concha instructed Mr. Olave that he was supposed to inform Diego Argaez, who was also present in the store, that he had arrived with the money. After Mr. Olave spoke with Diego Argaez, Ms. Concha inquired as to their conversation and Mr. Olave informed her that he was to give the money for the cocaine to her husband.
 
 
 80
 Contrary to Ms. Concha's characterization of herself as a fearful and innocent wife, the above series of events indicates that she voluntarily participated in the activities of the conspiracy. The fact that Ms. Concha was left alone by her husband to await Mr. Olave's arrival tends to support an inference that she was a trusted and willing member of the conspiracy. Not only did Ms. Concha actively seek out information regarding the drug transactions, but she facilitated the completion of the drug deal by encouraging Mr. Olave to come to the store so that the deal could be finalized with Diego Argaez. Ms. Concha's involvement in planning "safe routes" to and from Florida for the purpose of transporting cocaine demonstrates that she had a stake in maintaining the successful operation of the conspiracy.
 
 
 81
 Accordingly, we believe that the evidence as a whole amply supports an inference that Ms. Concha was a knowing and intentional participant in the conspiracy. Furthermore, the evidence adequately established that through her role in the August 22, 1988 transaction, Ms. Concha affirmatively helped in the success of the transaction such that the aiding and abetting conviction was proper. See Gonzalez, 933 F.2d at 443-44.
 
 
 82
 Finally, Ms. Concha argues that the telephone call between herself and Mr. Olave on August 22, 1988, could not have facilitated any narcotics offense because her role was limited to answering the telephone. A telephone call "facilitates" the commission of a narcotics offense within the meaning of 21 U.S.C. § 843(b) if it "comes within the common meaning of facilitate--'to make easier' or less difficult, or to assist or aid." United States v. Phillips, 664 F.2d 971, 1032 (5th Cir.1981), cert. denied sub nom. Meinster v. United States, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).
 
 
 83
 Contrary to Ms. Concha's assertions, her participation in the conversation with Mr. Olave on August 22, 1988 went beyond merely answering the telephone and handing it to her husband. Ms. Concha, knowing of the ensuing drug deal with Mr. Olave, affirmatively encouraged Mr. Olave to come over to the store where Mr. Argaez, the supplier, was waiting to make additional arrangements in connection with the deal. Thus, the jury could reasonably find that the August 22, 1988, call facilitated the sale by making the sale easier.
 
 7. Julio Rodriquez
 
 84
 Julio Rodriquez argues that the evidence demonstrates that he was attempting to swindle the conspirators, not to join them. However, Mr. Rodriquez fails to point to any probative evidence which supports his theory. Instead, we find that the record provides sufficient evidence for the jury's determination that Mr. Rodriquez knowingly and intentionally joined the conspiracy.
 
 
 85
 The evidence shows that in September 1988, Mr. Rodriquez was directly involved in facilitating a half kilogram cocaine deal between Julio Velasco and Mr. Olave. On September 27, 1988, Mr. Velasco agreed to sell 500 grams of cocaine to Mr. Olave but when the deal culminated he was only able to deliver 307 grams. Nevertheless, Mr. Velasco promised to provide the remaining grams to Mr. Olave the following morning.
 
 
 86
 In an effort to complete the half kilogram deal with Mr. Olave, Mr. Velasco contacted Julio Rodriquez. Mr. Velasco, his brother Diego Argaez, and Mr. Rodriquez had participated in an earlier transaction which involved the sale of one kilogram of cocaine to the "Ecuadorian," a customer of Mr. Rodriquez. Mr. Olave testified that Mr. Velasco and Mr. Argaez did not know the Ecuadorian, but they agreed to go through with the transaction because of their familiarity with Mr. Rodriquez. In fact, the evidence shows that Mr. Velasco and Mr. Argaez actually fronted the cocaine to Mr. Rodriquez so that he could sell it to the Ecuadorian. Such evidence indicates the existence of a level of trust between these appellants. In addition, Mr. Rodriquez's involvement in a transaction with Mr. Velasco, a committed member of the conspiracy, is evidence of an agreement on Mr. Rodriquez's part to provide customers to the single conspiracy and thus facilitate its overall purpose.
 
 
 87
 Although Mr. Velasco and his brother Diego Argaez satisfied their end of the bargain by providing the kilogram of cocaine to Mr. Rodriquez, the Ecuadorian still owed Mr. Velasco and Mr. Argaez money for the cocaine at the time of the deal between Mr. Velasco and Mr. Olave. Hence, Mr. Velasco hoped to obtain the grams of cocaine that he owed to Mr. Olave by reclaiming the cocaine that he had delivered to the Ecuadorian.
 
 
 88
 Contrary to Mr. Rodriquez's assertion that he and the Ecuadorian were attempting to cheat the conspirators, the evidence firmly supports an inference that he took steps to help Mr. Velasco reclaim the cocaine from the Ecuadorian. His cooperation in this regard is illustrated by the fact that he gave the Ecuadorian's address and place of work to Mr. Velasco when Mr. Velasco expressed his intention to reclaim the cocaine. Mr. Rodriquez contends that he cooperated only because he was threatened with bodily force. However, Mr. Rodriquez did not testify at trial, and the record does not otherwise substantiate such a claim. To the extent that he mounts a challenge to the weight given to the evidence by the jury, such a challenge exceeds the scope of our review. See Paiz, 905 F.2d at 1021.
 
 
 89
 We believe that Mr. Rodriquez's assistance supports a reasonable inference that he had a stake in the successful operation of the conspiracy. Moreover, his assistance reasonably supports an inference that Mr. Rodriquez believed that the benefits that he derived from the operation were dependent upon the success of the entire venture. See United States v. Cerro, 775 F.2d 908, 911 (7th Cir.1985). At the same time, this evidence negates Mr. Rodriquez's claim that he attempted to cheat the conspiracy.
 
 
 90
 Circumstantial evidence also supports the jury's finding that Mr. Rodriquez knowingly and intentionally participated in the conspiracy. Mr. Rodriquez's involvement with other members of the conspiracy may be inferred from Mr. Velasco's statement to Mr. Rodriquez that he was going to inform the "rest of the guys" of the problems that Mr. Velasco was having with Mr. Rodriquez's customer. At trial, Mr. Olave testified that "the rest of the guys" referred to the other people with whom Mr. Rodriquez dealt. To the extent that Mr. Velasco is a core conspirator, it is a fair inference that these people included other members of the conspiracy.
 
 
 91
 Accordingly we believe that Mr. Rodriquez's association with notorious members of the conspiracy, his deal with Mr. Velasco and his willingness to assist Mr. Velasco in his efforts to reclaim cocaine from one of his own customers, the Ecuadorian, reasonably support an inference that Mr. Rodriquez actively participated in the conspiracy.
 
 III. SENTENCING CHALLENGES
 A. Joint Challenge
 
 92
 The appellants jointly claim that the trial court committed reversible error by failing to give a tendered jury instruction concerning the determination of the amount of narcotics for which each appellant should be held accountable. Specifically, Judge Marovich refused to give the following tendered instruction:
 
 
 93
 If you find any defendant guilty of conspiracy, you must determine from the evidence the quantity of cocaine distributed as a result of the defendant's conduct or the conduct of co-conspirators in furtherance of the conspiracy that was known to the defendant or was reasonably foreseeable.
 
 
 94
 The appellants contend that this instruction was required because the determination of the scope of the agreement and the amount of narcotics for which a given defendant is responsible are factual issues which must be determined by the jury. However, the appellants do not dispute that such issues are relevant only to sentencing.
 
 
 95
 It is firmly established that "[i]n the federal system, facts germane only to sentencing are resolved by the judge, not the jury." United States v. Smith, 938 F.2d 69, 70 (7th Cir.) cert. denied, --- U.S. ----, 112 S.Ct. 254, 116 L.Ed.2d 208 (1991); See also United States v. Savage, 891 F.2d 145, 151 (7th Cir.1989) (not improper for district court to deny the defendant's request for a jury determination of the scope of the conspiracy because facts relevant only to sentencing are determined by the judge). Furthermore, the appellants have not cited any authority in support of their argument that a district court is required to provide a jury with a proffered jury instruction on the issue of the scope of the conspiracy. Hence, the district court's decision to preclude a jury determination on accountability and the scope of the conspiracy was entirely proper.
 
 
 96
 As an additional matter, the appellants jointly claim that the trial court "used improper standards of foreseeability in determining 'relevant conduct' under the Sentencing Guidelines." This argument must be distinguished from the argument raised by a number of appellants individually that the Guidelines were incorrectly applied; the propriety of the trial judge's application of the Guidelines will be addressed in the following section of this decision.
 
 
 97
 The appellants' claim that the trial judge employed an inappropriate standard under the Guidelines is not substantiated by anything in the record. The record shows that at the sentencing hearing of each of the appellants (except for that of Antonio Mojica, who was not found guilty of the conspiracy charge) the district judge cited our decision in Savage, 891 F.2d 145, as the applicable law on "relevant conduct" and foreseeability for sentencing purposes in narcotic conspiracy cases. On a number of occasions the district judge actually read into the record pertinent portions of Savage, including the following passage:
 
 
 98
 The amount of narcotics considered in sentencing for conspiracy includes not only the amounts involved in the transactions that were known to the defendant but also those that were reasonably foreseeable, reflecting the fact that each conspirator is responsible for acts and offenses of each one of his conspirators committed in furtherance of the conspiracy. The sentence should be imposed on the basis of the defendant's conduct or on the conduct of the conspiracy that was known to the defendant or was reasonably foreseeable.
 
 
 99
 Savage, 891 F.2d at 151; Sentencing Guidelines § 2D1.4.
 
 
 100
 We believe that this is an accurate statement of the standard of foreseeability to be applied by the district judge in determining relevant conduct when sentencing members of a narcotics conspiracy. See also United States v. Edwards, 945 F.2d 1387, 1394 (7th Cir.1991), cert. denied sub nom. Martin v. United States, --- U.S. ----, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992); United States v. Guerrero, 894 F.2d 261, 267 (7th Cir.1990); Sentencing Guidelines §§ 1B1.3(a), 2D1.1 and 2D1.4. Accordingly, we reject the appellants' joint contention that the district court employed an incorrect standard of foreseeability under the Sentencing Guidelines.
 
 B. Individual Challenges
 
 101
 Ten of the appellants individually challenge the district court's application of the Sentencing Guidelines to their convictions. (Antonio Mojica, Henry Cordoba, Marco Granada, Hector Granada, and Julio Velasquez do not appeal their sentences.) Each of the ten claims that the district court incorrectly determined his or her base offense level by miscalculating the amount of drugs for which he or she was responsible.
 
 
 102
 It is undisputed that the Guidelines apply to each of the sentencings in this case insofar as the conspiracy with which each of the appellants was charged began in 1988, after the effective date of the Guidelines. Moreover, all of the appellants were sentenced after November 1, 1989, the date on which certain amendments to the Guidelines took effect.
 
 
 103
 The essence of the sentencing challenge launched by each of the ten appellants concerns the proper application of the Guidelines in determining the base offense level assigned by the district judge to each appellant. The base offense level corresponds with the quantity of drugs involved in the offense. See Sentencing Guidelines § 2D1.1. In calculating the base offense level, and thus, the quantity of drugs for which a given appellant is to be held accountable, the Guidelines require that the district judge determine the "relevant conduct" of the defendant which is defined under the Guidelines as "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, ... that were in furtherance of that offense." Sentencing Guidelines § 1B1.3(a) (emphasis added).
 
 
 104
 Application Note 1 to Guideline § 1B1.3(a) clarifies the breadth of the "relevant conduct" to be considered by the sentencing judge and provides (with emphasis added):
 
 
 105
 In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly undertaken criminal activity that was reasonably foreseeable by the defendant.... Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.
 
 
 106
 In other words, in calculating a defendant's base offense level, a drug conspirator shall be held accountable "for all drug transactions that he was aware of or that he should have reasonably foreseen." Edwards, 945 F.2d at 1394 (quoting Guerrero, 894 F.2d at 267).
 
 
 107
 An important consideration in determining what is reasonably foreseeable to a given defendant is the level of commitment demonstrated by that defendant. In assessing foreseeability, we have held that
 
 
 108
 [R]easonable foreseeability means more than subjective awareness on the part of the individual defendants.... Instead, conduct of co-conspirators--even past conduct--can be considered "reasonably foreseeable" to a particular defendant if that defendant has demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or conduct.
 
 
 109
 Edwards, 945 F.2d at 1393-94.
 
 
 110
 In the present action, the ten appellants who individually challenge their sentences were not sentenced on the basis of the entire amount of drugs that flowed through the drug network. Rather, they were sentenced on the basis of the total amount of drugs that were sold by a member of the conspiracy to one of the government agents over a six month period (April 1988 through October 1988). This amount totalled 6.5 kilograms of cocaine.
 
 
 111
 As to each of these appellants, the trial judge found that he or she could reasonably have foreseen that the conspiracy would involve the distribution of 6.5 kilograms of cocaine. Based on this finding, the district judge assigned a base offense level to the appellants that corresponded with the distribution of 6.5 kilograms of cocaine. Notably, the base offense level that was ultimately assigned to each of these appellants is triggered by a finding that the conspiracy involved five or more kilograms of cocaine. See Sentencing Guideline § 2D1.1(c). Consequently, in order to affirm an appellant's sentence, we need only find that the appellant could reasonably foresee that the conspiracy that he or she joined involved five or more kilograms of cocaine.
 
 
 112
 The government bears the burden of proving the quantity of drugs that was reasonably foreseeable to a particular defendant by a preponderance of the evidence. United States v. Ross, 905 F.2d 1050, 1054 (7th Cir.), cert. denied, 498 U.S. 863, 111 S.Ct. 172, 112 L.Ed.2d 136 (1990). A district judge's finding that the government has met its burden is a finding of fact which we will reverse only if it is found to be clearly erroneous. See United States v. White, 903 F.2d 457, 460 (7th Cir.1990). "A finding of fact is clearly erroneous only if, after reviewing the entire evidence, we are left 'with the definite and firm conviction that a mistake has been committed.' " United States v. Herrera, 878 F.2d 997, 1000 (7th Cir.1989) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). Moreover, we are obliged to give due deference to a district court's application of the Guidelines to the facts. Herrera, 878 F.2d at 1000; 18 U.S.C. § 3742(e).
 
 
 113
 We now turn to the propriety of the base offense level for each of the ten appellants who have contested their sentences on this basis.
 
 1. Giovanni Saldarriaga
 
 114
 Giovanni Saldarriaga argues that he is entitled to "resentencing as a matter of law" solely on the ground that the judge's statement of reasons underlying the sentence imposed upon him was "conclusory." Mr. Saldarriaga relies on our recent decision in Edwards, 945 F.2d 1387, to support his contention that a failure to enunciate specific reasons underlying the sentence, without more, constitutes reversible error.
 
 
 115
 Mr. Saldarriaga misinterprets our ruling in Edwards. Although our decision in Edwards stresses the need for sentencing judges to make particularized findings in sentencing defendants under the Guidelines, that decision does not stand for the proposition that the judge's failure to go beyond a generic statement of reasons entitles a defendant to resentencing as a matter of law. Indeed, in Edwards, we expressly stated that in the absence of such individualized findings, we are required to determine, on a "defendant-by-defendant" basis whether a given defendant "has offered meritorious arguments for remanding" the case for resentencing. Edwards, 945 F.2d at 1400.
 
 
 116
 Moreover, a defendant is not entitled to a remand for resentencing on this basis where, as here, he fails to raise an objection to the district court's explanation at the time of sentencing. United States v. Caicedo, 937 F.2d 1227, 1236 (7th Cir.1991). Mr. Saldarriaga's failure to object to the explanation given by the judge at sentencing therefore waives this argument.
 
 
 117
 Notwithstanding Mr. Saldarriaga's waiver of this argument, the record reveals that the district judge did articulate particularized reasons for Mr. Saldarriaga's sentence. Judge Marovich first quoted the standard of foreseeability enunciated by this court in Savage. He then made the following findings: (1) that Mr. Saldarriaga was the "initial player" in the conspiracy insofar as it was he who introduced Mr. Olave to Mr. Concha; (2) that Mr. Saldarriaga was personally involved in the sale of 965 grams of cocaine; (3) that the evidence at trial connected him with eight other conspirators; and (4) that the evidence presented at trial demonstrated that he was more than casual acquaintances with each of the eight conspirators.
 
 
 118
 The trial judge's statement of reasons made it clear that he had considered the evidence of Mr. Saldarriaga's agreement to join a conspiracy of the scope alleged by the government. See Edwards, 945 F.2d at 1399. Thus, Judge Marovich offered more than a boilerplate explanation as a basis for his conclusion that Mr. Saldarriaga could reasonably foresee the distribution of 6.5 kilograms of cocaine.
 
 
 119
 Mr. Saldarriaga does not challenge the express findings made by the district judge nor has he advanced any basis for our concluding that the conspiracy that he joined was a narrower one or that the 6.5 kilograms of cocaine was not reasonably foreseeable to him. Accordingly, we decline to disturb the district court's finding that Mr. Saldarriaga could reasonably have foreseen the distribution of 6.5 kilograms of cocaine through the conspiracy.
 
 2. Horacio Velasquez
 
 120
 Horacio Velasquez makes the same argument for resentencing as advanced by Mr. Saldarriaga. We reject it for similar reasons. Like Mr. Saldarriaga, Mr. Velasquez failed to object to the explanation for imposing the sentence articulated by the district judge at the sentencing hearing. Hence, Mr. Velasquez has also waived this argument. Caicedo, 937 F.2d at 1236.
 
 
 121
 Further, despite Mr. Velasquez's contention, the record discloses that the district judge did make particularized findings with respect to Mr. Velasquez's role in the conspiracy. He found that (1) Mr. Velasquez directly participated in two transactions which involved a total of "about 1200, 1250 grams of cocaine"; (2) one of the deliveries with which he was involved was "amongst the biggest amounts that were involved and represents about 20 percent of the total that was involved in the conspiracy"; and (3) Mr. Velasquez had more than a casual relationship with at least eight conspirators, including such central figures as Diego Argaez, Marco Granada, and Jaime Concha.
 
 
 122
 The district judge's statements illustrate that he had considered the evidence of Mr. Velasquez's agreement to join the conspiracy of the scope alleged by the government. Hence, notwithstanding his waiver of this argument, we find no support in the record for Mr. Velasquez's assertion that the district judge failed to articulate the reasons underlying the sentence imposed upon him. Like Mr. Saldarriaga, Mr. Velasquez does not challenge the district judge's findings themselves, nor does he articulate a basis for holding that he joined a narrower conspiracy. Therefore, we decline to vacate the district judge's determination that Mr. Velasquez had an extensive role in the conspiracy such that he could reasonably have foreseen the distribution of 6.5 kilograms of cocaine.
 
 3. Jose Castaneda
 
 123
 Jose Castaneda claims that resentencing is required because the evidence does not show an agreement to distribute cocaine beyond his one proved sale of 499 grams. The record reveals that the district judge, after quoting the standard for relevant conduct and foreseeability under Savage, offered the following explanation for sentencing Mr. Castaneda on the basis of 6.5 kilograms of cocaine:
 
 
 124
 Based on the evidence that was adduced at trial, it .. is the judgment of the Court that Mr. Castaneda also could have reasonably foreseen the amount of cocaine that was involved in the conspiracy and, therefore, he is to be charged with that amount....
 
 
 125
 Although the district judge offered a generic explanation for assigning the base offense level of 6.5 kilograms to Mr. Castaneda, we are obligated to assess whether Mr. Castaneda offers a meritorious argument for remanding his case for resentencing. Edwards, 945 F.2d at 1399-1400.
 
 
 126
 Mr. Castaneda identifies no evidence to substantiate his claim that the district judge erroneously found that the distribution of 6.5 kilograms of cocaine was reasonably foreseeable to him. On the contrary, the evidence discloses that Mr. Castaneda participated in the conspiracy throughout the entire six month period charged in the indictment. He was directly involved in a one-half kilogram deal with Mr. Olave and Socorro Granada in April 1988. During this transaction, Socorro Granada informed Mr. Olave that she had dealt with Mr. Castaneda, or "El Tio" (as he was also called) on prior occasions. Also, Mr. Olave testified that in October 1988, Mr. Castaneda offered to supply Mr. Olave and his customers with drugs if he or his customers had such a need.
 
 
 127
 A taped conversation between Jaime Concha and Gloria Concha on October 1, 1988, revealed that they believed that Mr. Castaneda owed them money. Finally, when Mr. Castaneda was arrested in January 1989, the police discovered that his car was equipped with a stash box which, according to testimony at trial, was used to transport multiple kilograms of cocaine.
 
 
 128
 This evidence supports Mr. Castaneda's involvement in the overall conspiracy. Due to the breadth and consistency of his involvement in the conspiracy, Mr. Castaneda fails in his contention that 6.5 kilograms of cocaine was not reasonably foreseeable to him. Accordingly, the district judge did not err in concluding that Mr. Castaneda was accountable for 6.5 kilograms of cocaine.
 
 4. James Velasquez
 
 129
 Through his role as a "look-out," James Velasquez was found guilty of conspiracy and aiding and abetting in the June 21, 1988, distribution of 249.89 grams of cocaine. He contends that the district judge committed clear error by holding him accountable for the entire 6.5 kilograms of cocaine that was seized in the overall conspiracy.
 
 
 130
 Judge Marovich provided the following rationale for assigning a base offense level of 6.5 kilograms to Mr. Velasquez:
 
 
 131
 If this 2.49--or 249.89 grams of cocaine is all that James Velasquez could have reasonably foreseen, the law as I understand it, says that is all that he should be charged with at sentencing. That leaves the question: Is that all that he could have reasonably foreseen? * * * you can draw whatever inferences you can or should that are reasonable, like use your common sense in coming to some conclusion as to whether or not James Velasquez could have reasonably foreseen, as a member of the conspiracy ... that other things by other people were going down in the amounts of 6.5 kilos. The evidence convinces me that he did.
 
 
 132
 Prior to making this statement, the district judge noted that there was evidence tying Mr. Velasquez to a number of co-conspirators.
 
 
 133
 Mr. Velasquez claims that his role in the conspiracy was limited to acting as a look-out for one single aborted narcotics transaction. The government points to Mr. Velasquez's proved participation in the quarter kilogram transaction on June 21, 1988, and to his knowledge of the transaction of an undisclosed quantity involving Marco Granada, prior to the June 21, 1988, deal. The government also attempts to attribute counter-surveillance activity to Mr. Velasquez in connection with a second quarter kilogram transaction on June 29, 1988. However, the government offers no evidence which demonstrates that Mr. Velasquez's commitment to the conspiracy extended beyond the latter date. Moreover, the degree of Mr. Velasquez's participation through June 29, 1988 does not raise an inference that he was aware of or involved in the conspiracy's activities beyond June 29, 1988.
 
 
 134
 At best, the evidence offered by the government ties Mr. Velasquez to the conspiracy for a fixed period of time and thus, illustrates that Mr. Velasquez's commitment to the conspiracy was limited in scope. Hence, although Mr. Velasquez was liable for conspiracy, he should be resentenced to reflect the fact that the criminal activity that he agreed to undertake did not extend beyond the events of June 29, 1988. See Note 1, Sentencing Guidelines § 1B1.3(a).
 
 
 135
 As an additional matter, Mr. Velasquez argues that the sentencing court failed to consider whether he was entitled to a reduction of his base offense level under § 3B1.2 of the Sentencing Guidelines which permits a reduction where a defendant plays a mitigating or significantly less culpable role in the offense. Mr. Velasquez failed to raise this issue at the sentencing hearing, thus waiving the issue on appeal. United States v. Macias, 930 F.2d 567, 569-70 (7th Cir.1991). However, since we have already determined that Mr. Velasquez must be resentenced on other grounds, the district court should afford him the opportunity to raise the "less culpable" issue at his resentencing.
 
 5. Rolando Candelo
 
 136
 At Rolando Candelo's sentencing, the district judge found that Mr. Candelo could reasonably have foreseen that 6.5 kilograms of cocaine would flow through the conspiracy. Mr. Candelo contends that his status as a "late entrant" renders this finding clearly erroneous.
 
 
 137
 The government concedes that Mr. Candelo joined the conspiracy in the midst of its operations. However, it argues that his level of participation demonstrates that the earlier distributions of cocaine occurred as part of the conspiracy to which Mr. Candelo knowingly agreed to join.
 
 
 138
 Mr. Candelo's one proved sale of 250 grams of cocaine occurred in August 1988. The evidence offered at trial, however, established that he participated in the conspiracy as early as July 1988, at which time he offered to give some drug business to Mr. Olave. Mr. Olave testified that Mr. Candelo was considered to be an experienced drug dealer who was accustomed to dealing with "kilo quantities" of cocaine and was familiar with the price structure for that quantity.
 
 
 139
 Mr. Candelo was involved in the conspiracy's activities through its final stages. He visited Jaime Concha's jewelry store in September 1988 at which time he participated in a telephone call between Jaime Concha and Hector Granada concerning Hector Granada's trip to Florida and the Bahamas. Also his name was mentioned during a drug deal between Henry Cordoba and Henry Olave in September 1988 by Henry Cordoba when he was discussing drug suppliers.
 
 
 140
 On the basis of this evidence, we cannot conclude that the trial court's conclusion that Mr. Candelo could reasonably foresee "that 6.5 kilograms of cocaine, or more than 5 kilograms of cocaine were involved in this conspiracy" was clearly erroneous.
 
 6. Jaime Concha
 
 141
 Like Giovanni Saldarriaga and Horacio Velasquez, Jaime Concha argues that the district court's failure to state specific reasons for the sentence that was imposed upon him, without more, justifies resentencing. We have already concluded that this argument is without merit in light of our decision in Edwards and on the basis of waiver.
 
 
 142
 Further, the sentencing transcript reveals that the district judge made the following particularized findings at Mr. Concha's sentencing hearing:When we are dealing with Mr. Jaime Concha and the question of whether or not he was a member of this conspiracy, the jury has already answered that question and in answering the question of what amounts [were] foreseeable for him to know about as far as this conspiracy is concerned, the indications to me are that he himself, just taking the four substantive counts and forgetting the attempt count, was involved in 3.438 kilos of cocaine. That was more than half of everything that was charged here in the entire conspiracy.
 
 
 143
 If there was any one person who had more evidence tied to all of the other persons that Mr. Jaime Concha, I don't know who it is. My score-keeping indicates that at the very least there was evidence tying Mr. Jaime Concha in to ... 20 out of 27 [defendants].
 
 
 144
 On the basis of the evidence adduced in open court, it is my conclusion that Mr. Jaime Concha could have reasonably foreseen the amount of 6.5 kilos and, therefore, it is my finding that he should be charged with that amount,....
 
 
 145
 Contrary to Mr. Concha's contention, the district judge's statements made clear that he had considered the evidence of Mr. Concha's agreement to join a conspiracy of the scope alleged by the government.
 
 
 146
 A further problem with Mr. Concha's position is the fact that he fails to identify any evidence in the record to suggest that it was not reasonably foreseeable to him that 6.5 kilograms of cocaine would run through the conspiracy. Quite the contrary, there was an abundance of evidence to support a finding that Mr. Concha was "substantially involved in the conspiracy and knew or reasonably should have known of the quantity of drugs handled by the conspiracy." Edwards, 945 F.2d at 1394. There was evidence that Mr. Concha was consistently involved in large transactions throughout the entire six-month span charged by the government. In addition to the proved sale of three kilograms of cocaine, the evidence showed that a customer referred by Mr. Concha purchased 3 kilograms from Julio Velasco. Mr. Olave testified that in April 1988 he was informed that Mr. Concha was expecting a 100 kilogram delivery of cocaine.
 
 
 147
 That Mr. Concha's role in the conspiracy was significant is also supported by the fact that he planned safe routes for drug trafficking from Florida, and was intimately aware of the drug dealings of his co-conspirators. Therefore, Mr. Concha cannot successfully argue that he could not reasonably have foreseen that the conspiracy he joined encompassed 6.5 kilograms of cocaine.
 
 7. Elmer Velasquez
 
 148
 Elmer Velasquez challenges the district judge's sentencing him on the basis of 6.5 kilograms of cocaine claiming that such finding was clearly erroneous in view of the evidence. We disagree.
 
 
 149
 At trial, it was proved that Mr. Velasquez personally distributed 249.89 grams of cocaine on June 22, 1988. The government also connected Mr. Velasquez to Jorge Suarez less than one hour before Mr. Suarez sold a quarter kilogram of cocaine to Mr. Olave on June 29, 1988. Indeed, Mr. Velasquez admits, in his brief, that in addition to Horacio and Rudolfo Velasquez, he had cocaine dealings with Jorge Suarez who, according to the testimony of Mr. Olave, received loads (multiple kilogram shipments) of cocaine from Florida and was a notorious supplier. There was evidence which revealed that Mr. Velasquez was a significant participant through the final stages of the conspiracy. For example, during a tape recorded conversation on September 28, 1988, Mr. Concha suggested that Mr. Olave call Elmer Velasquez if he needed either a kilogram or a quarter kilogram of cocaine.
 
 
 150
 Thus, Mr. Velasquez's significant and steady participation in the conspiracy belies his contention that he could not reasonably have foreseen the movement of 6.5 kilograms of cocaine through the conspiracy. Because we cannot say that the district judge's finding that Mr. Velasquez was accountable for 6.5 kilograms of cocaine "leaves us with a definite and firm conviction that a mistake has been made," we conclude that this finding was not clearly erroneous.
 
 8. Hernan Nestor Bermudez
 
 151
 Hernan Nestor Bermudez asserts that he was a "late entrant" to the conspiracy insofar as his involvement encompassed only a three-day period in late September 1988, namely September 27, 1988, through September 29, 1988. However, the evidence against Mr. Bermudez establishes that he was a substantial supplier who had a close relationship with the conspiracy.
 
 
 152
 It was proved at trial that Mr. Bermudez was directly involved in the sale of 1.4 kilograms of cocaine. In view of the entire 6.5 kilograms charged to the overall conspiracy, his role must be regarded as substantial. Moreover, the evidence offered by the government negates Mr. Bermudez's claim that he participated in the conspiracy only in its final stages. Specifically, Mr. Olave testified that on September 27, 1988, Mr. Velasco (who pleaded guilty to conspiring to distribute cocaine in excess of five kilograms) gave a detailed account of the process utilized by him and Mr. Bermudez in their handling of cocaine transactions. This evidence demonstrates that Mr. Bermudez and Mr. Velasco had an established "working relationship" that had developed prior to the September 28, 1988 transaction.
 
 
 153
 Taken as a whole, we believe that the district judge's finding that Mr. Bermudez could reasonably have foreseen that the conspiracy that he joined involved 6.5 kilograms of cocaine was not clearly erroneous.
 
 9. Gloria Concha
 
 154
 Gloria Concha contends that the district judge failed in its duty under the Guidelines to sentence her in accordance with her personal level of culpability. In other words, she asserts that the evidence only showed that she had a minor role in the possession and distribution of 948.7 grams of cocaine. The record contradicts her assertion.
 
 
 155
 The evidence shows that Ms. Concha committed herself to a conspiracy whose scope exceeded her proved participation in the sale of 948.7 grams of cocaine in August 1988. In fact, her involvement in the conspiracy began in April 1988 and lasted through its final stages. Mr. Olave testified that in April 1988, he had a discussion with Ms. Concha and her husband Jaime Concha regarding safe routes to transport drugs from Florida. A taped telephone conversation of August 1988 reveals that Ms. Concha discussed a future sale of a kilogram of cocaine with Mr. Olave and discouraged him from going into details regarding the proposed deal over the telephone. Other telephone calls that were recorded over the six month period reveal that Ms. Concha (1) discussed the availability of cocaine with other co-conspirators, (2) ensured that members of the conspiracy were informed of the whereabouts of various co-conspirators and the progress of various deals and (3) was familiar with the conspiracy's code.
 
 
 156
 Because her involvement extended over the entire six month period and her participation can be viewed as substantial, we believe that the district judge correctly found that she could reasonably have foreseen that 6.5 kilograms of cocaine would flow through the conspiracy in which she joined.
 
 10. Julio Rodriquez
 
 157
 The district judge found that Julio Rodriquez was also accountable for the entire 6.5 kilograms of cocaine that were handled by his co-conspirators. Mr. Rodriquez claims that this finding was clearly erroneous. Despite the deference that is to be paid to the district judge's application of the Guidelines, we believe that a mistake was made which entitles Mr. Rodriquez to resentencing.
 
 
 158
 The jury found that Julio Rodriquez purchased one kilogram of cocaine from the conspiracy in September 1988 for resale to one of his customers. In addition, there was evidence that later in September, Mr. Rodriquez assisted Mr. Velasco in his attempt to perfect a one-half kilogram deal with Mr. Olave. The government attempts to attribute to Mr. Rodriquez not only his own conduct but also that of his co-conspirators that had occurred prior to September 1988 through telephone calls that were made between the Concha's jewelry store and Mr. Rodriquez's garage as early as February 1988. Also, the government identifies a photograph of Mr. Rodriquez with Mr. Concha on August 22, 1988, the day that Mr. Concha sold one kilogram of cocaine to Mr. Olave.
 
 
 159
 While such evidence may suggest that Mr. Rodriquez was acquainted with Mr. Concha before September 1988, there is no evidence that Mr. Rodriquez entered into an agreement to become part of the conspiracy prior to September 1988. Likewise, there is no evidence to suggest that Mr. Rodriquez was aware of the prior activities of his co-conspirators or that, despite his late entrance, he embraced the earlier conduct. In the absence of any evidence linking Mr. Rodriquez to the activities of the conspiracy prior to September 1988, Mr. Rodriquez's base offense level must be recalculated to reflect the lesser quantity of cocaine that was reasonably foreseeable to him.
 
 IV. JURY SELECTION
 
 160
 In their joint brief, the appellants, each of whom are Hispanic, (Mr. Bermudez is a black Hispanic) contend that they are entitled to a new trial because the government exercised its peremptory challenges to exclude seven prospective jurors--six blacks and one Hispanic--in violation of the mandate in Batson v. Kentucky, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). In Batson, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits the state from exercising its peremptory challenges to exclude members of the defendant's race from the petit jury. Batson, 476 U.S. at 85, 106 S.Ct. at 1716-17. The Due Process Clause of the Fifth Amendment extends this prohibition to the federal government. United States v. Williams, 934 F.2d 847, 849 n. 1 (7th Cir.1991). The Supreme Court abolished the "same race" requirement of Batson in Powers v. Ohio, --- U.S. ----, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), in which it held that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race." Powers, at ----, 111 S.Ct. at 1366.
 
 
 161
 The defendant ultimately bears the burden of demonstrating a discriminatory animus on behalf of the prosecution. Hernandez v. New York, --- U.S. ----, ----, 111 S.Ct. 1859, 1873, 114 L.Ed.2d 395 (O'Connor, J., concurring) (1991). Such burden obligates the defendant to make "a prima facie case of purposeful discrimination in the selection of the petit jury by presenting facts and relevant circumstances that raise an inference that the government used the peremptory challenges in order to exclude venire members because of their race." United States v. Nichols, 937 F.2d 1257, 1262 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 989, 117 L.Ed.2d 151 (1991). Once the defendant has presented a prima facie case, the burden shifts to the prosecution to articulate a neutral reason for the exclusion. Batson, 476 U.S. at 94, 106 S.Ct. at 1721. While the government's explanation for the challenges "need not rise to the level justifying exercise of a challenge for cause," Batson, 476 U.S. at 94, 106 S.Ct. at 1721, they "must be clear and reasonably specific, presenting legitimate reasons that are related to the particular case." Nichols, 937 F.2d at 1262.
 
 
 162
 The trial judge then must determine whether the defendant has established that the prosecution's challenges were based on discriminatory criteria. Because the trial judge's determination will involve questions of credibility, those findings should be given great deference and will be upheld unless they are clearly erroneous. United States v. Ferguson, 935 F.2d 862, 864 (7th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 907, 116 L.Ed.2d 807 (1992). We need not decide whether the appellants successfully established a prima facie case of purposeful discrimination because we believe that the government offered a race-neutral reason for its peremptory challenges.
 
 
 163
 In the present action, the record discloses that the venire was comprised of 40 persons: of the 40, twelve were black and one was Hispanic. Six of the blacks were empaneled and the remaining six blacks and the one Hispanic were struck by the government. After the prosecution and the appellants had exercised all of their peremptory strikes and the names of the individuals comprising the petit jury were announced by the court, a motion for a mistrial was made by Mr. Bermudez's attorney on the ground that seven minority persons had been excused by the government. Notably, no objection was raised by any of the appellants concerning the government's use of a peremptory challenge as to a particular juror. Although the motion for a mistrial was made only on behalf of Mr. Bermudez, the court allowed the remaining defendants to join in the motion. An explanation for the exercise of its peremptory challenges as a whole was offered by the government, and the trial court denied the appellants' motion.
 
 
 164
 First, the appellants argue that a new trial is warranted because the government volunteered an explanation for the exercise of its peremptory challenges prior to being requested to offer such an explanation by the court. Although the trial judge is obligated to make a prompt inquiry when the defendant challenges the propriety of the government's use of its peremptory challenges, we find no error where the government volunteers an explanation for its challenges prior to the judge's requiring it. Furthermore, the record reveals that, contrary to the appellants' assertion, the government offered its explanation only after the court requested that it do so. Accordingly, we find the appellants' request for a new trial on this basis to be without merit.
 
 
 165
 Next, the appellants argue that they are entitled to a new trial because the government failed to articulate a "clear and reasonably specific explanation of [its] legitimate reasons for exercising the challenges." The essence of the appellants' motion for a mistrial was that the government's use of its nine challenges to strike six blacks and one Hispanic resulted in "systematic exclusion" of blacks from the petit jury. In response to the appellants' objection on the basis of "systematic exclusion," as opposed to an objection as to the challenge of a particular juror, the government offered the following explanation:
 
 
 166
 [B]asically, we excluded, regardless of race, young single people. We thought they would not be the kind of jurors we were looking for. We excluded also young people like Mrs. Lamb, who we thought was not the type of juror that was suitable for our purposes. We would prefer family people. We would prefer people with children. We basically excluded people like that.
 
 
 167
 With regard to Ms. Dorothy Scott, who was one of our peremptory challenges who was, she had indicated she had a hearing problem, and she asked your Honor to excuse her for cause. We decided we would rather use a peremptory on her than have an unhappy juror sitting on the panel.
 
 
 168
 After the government offered this explanation, the appellants were given an opportunity to respond to the government's explanation; the appellants made no attempt to object to the validity of the government's explanation as applied to any particular juror. The trial court then denied the appellants' motion for a mistrial. Although the appellants correctly observe that the trial judge did not specifically state that he believed the government's explanation was not pretextual, we conclude that that ruling was implicit in his decision to deny the appellants' motion for a mistrial.
 
 
 169
 To the extent that the appellants contend that the explanation offered by the government was deficient because it did not legitimately apply to each of the individual jurors, we believe that the appellants have waived this argument on appeal. The record reveals that the government did not articulate individual reasons for challenging each juror because the defendants failed to raise an objection to any particular juror when the peremptory challenges were exercised. Rather, the government responded to the appellants' general objection that seven minority persons had been challenged by the government with a general explanation--one that did not purport to encompass each and every juror. If the appellants objected to the use of a peremptory challenge by the government as to a particular juror, they were obligated to raise that issue at trial. Thus, the appellants have waived the question of the propriety of the government's challenge as to particular jurors, and we decline to address that issue on appeal. See United States v. Briscoe, 896 F.2d 1476, 1487 n. 9 (appellants waived the issue of whether the government's challenge as to juror Allen was proper where they failed to object at the time that the government exercised its strike against her).
 
 
 170
 That being the case, the appellants' present argument amounts to a claim that the government's general explanation for its challenges was not neutral. The government stated that the basis for excluding the six blacks and the one Hispanic member was its desire to exclude young, single people or people without children. A review of the record reveals that the reason given by the government is supported by the biographies of the excused jurors given during jury selection.
 
 
 171
 Four of the nine jurors excused by the government (Alfano, Odell, Pittman and Thompson) all stated that they were single and none mentioned having any children. While juror Resa did not expressly specify her marital status, she stated that she lives with her father, is a sophomore at Loyola University, and is always with her grandmother. This information, along with the fact that she didn't mention a husband, supports a reasonable inference that she is single and has no children. While juror Davis indicated that she had children, her failure to mention a husband in her biography supports a reasonable inference that she is single.
 
 
 172
 The government concedes that juror Scott did not fit within the government's general explanation; however, the government expressly stated that she was challenged because of her hearing problem and her desire to be excused by the court for cause. Although juror Lamb indicated that she was married, she otherwise fit within the government's explanation insofar as the record reveals she was only recently married, was approximately 24 years old and did not mention having any children. Furthermore, the government's claim that it preferred jurors with children is supported by the fact of the 19 jurors who expressly stated that they had children, only two were excused by the government: juror Scott, who had a hearing problem, and juror Davis, who did not comment on her marital status.
 
 
 173
 The appellants point out that contrary to the government's explanation, it excused juror Walker, who was married. However, as we have previously noted, the appellants have waived the argument that the government's use of a peremptory challenge as to any particular juror was improper.
 
 
 174
 We conclude that the government gave a race-neutral explanation in response to the appellants' general systematic exclusion objection. The trial judge, who was in a better position to assess credibility and analyze all of the relevant circumstances, denied the motion for a mistrial and implicitly accepted the government's reasons as legitimate. Reasons such as age and marital status are legitimate reasons for the exercise of peremptory challenges in cases analogous to the case at hand. Nichols, 937 F.2d at 1264; Ferguson, 935 F.2d at 865. In the case at bar, there are additional facts that weaken the argument that the government's strikes were based on an intent to discriminate; the appellants do not establish that white jurors who fit within the government's explanation were empaneled, and six blacks of twelve on the venire were empaneled. See Nichols, 937 F.2d at 1264 (where blacks are seated on the jury, motive to discriminate is negated). Accordingly, we find no error in the trial judge's ruling denying the appellants' motion for a mistrial.V. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL
 
 
 175
 Hector Granada challenges his conviction on the ground that his trial counsel's representation fell below an objective standard of reasonableness and prejudiced the outcome of the trial. Essentially, he alleges the following instances of ineffective assistance:
 
 
 176
 (1) Denial of Mr. Granada's right to present his defense by failing to file a motion for severance based upon 15 exculpatory affidavits provided by Mr. Granada;
 
 
 177
 (2) Failure to conduct a thorough investigation into the merits of Mr. Granada's defense by not honoring Mr. Granada's request for retranslation of the tapes and by withholding "pertinent information" from Mr. Granada; and
 
 
 178
 (3) Failure to inform Mr. Granada that his right to testify was his right to assert or waive.
 
 
 179
 As a preliminary matter, the government has filed a motion to strike the individual brief and argument of Mr. Granada in connection with his ineffective assistance of counsel claim because he has failed to support his factual allegations by citations from the record as required under Circuit Rule 28(d)(2) and because he has failed to "state a claim that can be decided on the record in this case." Because we will not grant Mr. Granada's request, we need not consider the government's motion to strike Mr. Granada's brief. Sears, Roebuck and Co. v. The Murray Ohio Manufacturing Co., 949 F.2d 226, 227 n. 1 (7th Cir.1991).
 
 
 180
 To launch a successful ineffective assistance of counsel argument, Mr. Granada must establish that his counsel's performance fell below "an objective standard of reasonableness" based upon "prevailing professional norms." Strickland v. Washington, 466 U.S. 668, 687-91, 104 S.Ct. 2052, 2064-66, 80 L.Ed.2d 674 (1984). When reviewing charges of deficient performance, we are cognizant of the strong presumption that counsel's performance "falls within the wide range of reasonable professional judgment." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. To overcome this presumption, Mr. Granada must demonstrate that his trial counsel's performance was deficient and that his "counsel's deficiencies prejudiced his defense." United States v. Reiswitz, 941 F.2d 488, 496 (7th Cir.1991).
 
 
 181
 It is undisputed that Mr. Granada's appeal marks the first time that the issue of ineffective assistance of counsel has been raised. We have repeatedly held that ineffective assistance of counsel claims are best dealt with at the district court level through a motion for a new trial, see Rule 33, Federal Rules of Criminal Procedure, or through the collateral relief available under 28 U.S.C. § 2255. United States v. Aquilla, 976 F.2d 1044, 1053 (7th Cir.1992); Reiswitz, 941 F.2d at 495; United States v. Limehouse, 950 F.2d 501, 503 (7th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1962, 118 L.Ed.2d 563 (1992); United States v. Asubonteng, 895 F.2d 424, 428 (7th Cir.) cert. denied sub nom. Rivers v. United States, 494 U.S. 1089, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990). The reason for this preference is that "the district court, unlike the appellate court, has had the opportunity to observe counsel's performance firsthand," Limehouse, 950 F.2d at 503, and typically, there has been no chance to develop and include in the record evidence relating to the ineffectiveness issues. Asubonteng, 895 F.2d at 428.
 
 
 182
 Nevertheless, we have the discretion to resolve ineffective assistance claims without the benefit of the district court's views in circumstances where the record is "sufficiently developed" to consider the issue, Asubonteng, 895 F.2d at 428, or where "both parties ask us to resolve the matter, the question has been briefed and argued, and the entire trial record is before us." Aquilla, at 1053 (citing Reiswitz, 941 F.2d at 495). In this case, both parties have not requested that we resolve this issue. Furthermore, the record before us is not clear regarding the reasons underlying the trial counsel's conduct. Because Mr. Granada's allegations, which primarily concern litigation strategy, depend upon evidence outside the record, we decline to rule on this issue; Mr. Granada is free to raise his ineffective assistance claim in a collateral proceeding. See United States v. D'Iguillont, 979 F.2d 612, 614-15 (7th Cir.1992) (merits of ineffective assistance of counsel claim will not be addressed on direct appeal where both parties have not requested us to resolve issue and the record is not clear regarding trial counsel's reasons for his conduct); see also United States v. Fisher, 772 F.2d 371, 373 (7th Cir.1985) (appellant's ineffective assistance of counsel claim is better left for trial court where allegations required appellate court to depend on evidence outside the record).
 
 VI. CONCLUSION
 
 183
 The appellants have raised a number of other claims, jointly and individually. Since they are plainly without merit, they will not be discussed herein. James Velasquez and Julio Rodriguez must be resentenced, and the case will be remanded to Judge Marovich for that limited purpose. The sentences of the remaining appellants will not be disturbed. In all other respects, the judgments of the trial court are AFFIRMED.
 
 ORDER In No. 90-1277
 
 184
 On consideration of the petition for rehearing with suggestion for rehearing en banc filed by defendant appellant on February 2, 1993, no judge in active service has requested a vote thereon, and all of the judges on the original panel have voted to deny a rehearing. Accordingly,
 
 
 185
 IT IS ORDERED that the aforesaid petition for rehearing be, and the same is hereby, DENIED.
 
 ORDER In No. 90-1313
 
 186
 On consideration of the petition for rehearing filed by defendant-appellant on February 1, 1993, all of the judges on the original panel having voted to deny the same,
 
 
 187
 IT IS HEREBY ORDERED that the aforesaid petition for rehearing be, and the same is hereby, DENIED.
 
 
 
 [1]
 Honorable Myron L. Gordon, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation